IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MINNIE TAYLOR, Individually and
as Personal Representative of
the ESTATE OF LOUIE TAYLOR,
and HAROLD CUTHAIR,

        Plaintiffs,

vs.         Case No.
                21-cv-00613-GJF-JFR
THE UNITED STATES OF AMERICA,

        Defendant.


**DEPOSITION OF VIRGINIA E. HARVEY, M.D.**
March 25, 2022
8:30 a.m.
via videoteleconference


PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MS. CHRISTINE H. LYMAN
     Attorney for the Defendant




REPORTED BY: MABEL JIN CHIN, NM CCR #81
     Bean & Associates, Inc.
     Professional Court Reporting Service
     201 Third Street Northwest, Suite 1630
     Albuquerque, New Mexico 87102

(6380N) MC

Exhibit C

**Page 10**

1   A. Yes.
2   Q. Your current expert fee schedule, can I do
3   the same for that?
4   A. Yes.
5   Q. Any invoices from and/or records of payment
6   to any contractor, assistant, or any other person who
7   assisted you in preparing your opinions. Did anybody
8   assist you in preparing your opinions?
9   A. I do not.
10  Q. And your expert report dated January 18,
11  2022, and any updates, addenda, or supplements to your
12  expert report. I believe I have one addendum to your
13  report. Are there any others?
14  A. There are not.
15  Q. A list of cases in which you have testified
16  in the last four years as an expert, and I believe
17  there are none; is that correct?
18  A. Correct.
19  Q. A list of publications you have authored or
20  coauthored in the last 10 years. There is a list in
21  your CV. Is that a current list?
22  A. It is.
23  Q. Copies of any publications you have written
24  or written by others that you believe are germane to
25  the issues in this lawsuit or that you relied on in

**Page 11**

1   forming your opinions. I have not seen anything like
2   this, although there are some articles cited in your
3   report. Are you able to provide me with copies of
4   these articles?
5   A. I am.
6   Q. Okay. Copies of all literature cited in
7   your expert report. I think it's kind of redundant,
8   but the same goes for this as well.
9       All documents you received in this case from
10  plaintiff's counsel or any other source. I believe I
11  have some -- a list of documents that were provided to
12  you. But do you have any notes, or anything taken on
13  any hard copies that were sent to you?
14  A. No.
15  Q. Any communications between you and counsel
16  identifying facts or data or assumptions that you
17  relied upon in your expert report. Do you believe we
18  have everything responsive to this number 7?
19  A. I do.
20  Q. And number 8, the records, depositions, and
21  any other materials you reviewed when forming your
22  opinions in your expert report. Are all of these
23  materials reflected in the materials listed in your
24  report and addendum?
25  A. Um -- I received some materials after I had

**Page 12**

1   submitted my report and addendum, and those include
2   the video footage that I had not previously seen prior
3   to my submission of my report.
4   Q. Is it fair to say that since you did not
5   receive these materials, you didn't rely on them in
6   forming your opinions in the report and addendum?
7   A. I did not rely on them, but they do not
8   change my opinion.
9   Q. Okay. That's helpful.
10      All documents you used to support the
11  opinions and conclusions you reached in this case, and
12  any updates and addenda. Do you believe that all the
13  documents you used to support your opinions and
14  conclusions are reflected in the list of materials in
15  both your report and addendum?
16  A. Yes.
17  Q. And then your billing file for this case,
18  including any and all invoices or other information
19  relating to compensation that you have submitted to
20  plaintiff's counsel. I am not sure what the last
21  invoice was that you submitted, but are there any
22  outstanding invoices?
23  A. There are not.
24  Q. Okay. And do you recall when the last
25  invoice was that you sent to plaintiff's counsel?

**Page 13**

1   A. I can look it up if you would like me to.
2   Q. Sure. And for the record, what are you
3   looking at off to the side?
4   A. I am looking at the copy of the
5   correspondence that you received that I have also
6   received.
7   Q. Okay. And so just to be clear, I think that
8   Mr. Buffington's office sent me a four-page supplement
9   to that over E-mail maybe a day or two ago. I don't
10  know if you have had a chance to see that, but we'll
11  review that in case you haven't.
12  A. I do not recall receiving anything a day or
13  two ago from their office.
14  Q. Okay.
15  A. His office.
16  Q. Okay. But feel free to look at what you
17  have and let me know if you think anything is missing.
18  A. Okay. I do not think anything is missing.
19  The date on the last invoice that I see here is from
20  2/7/2022.
21  Q. And is that the last, I guess, billable work
22  that you did for the firm?
23  A. That was when I submitted my addendum, and I
24  have not done any other significant work since that,
25  as far as I recall, aside from some very, very short

production@litsupport.com    Bean & Associates, Inc. 201 Third Street NW, Ste. 1630, Albuquerque New Mexico 87102    505.843.9494

Exhibit C

150

1  A. I think if he was hallucinating and agitated
2  he would have benefited from a medical evaluation.
3  Q. Okay. And then when you say appropriate
4  medical care, are you assuming that is a type of
5  medical care that you said that you would provide if
6  you had seen Mr. Taylor that day?
7  A. Yes.
8  Q. Okay. Now, I would like to now move to your
9  addendum report, and I am going to put it up in just a
10 second here.
11 A. Sure.
12 Q. Let me make it a little bit bigger.
13    So, this addendum report, does this look
14 like the addendum report you drafted on or about
15 February 7, 2022?
16 A. Yes.
17 Q. Okay. And is that your signature at the
18 bottom here?
19 A. It is.
20    MS. LYMAN: Okay. Mabel, I would like to
21 mark this as Exhibit 7.
22    (Exhibit 7 marked.)
23 Q. (By Ms. Lyman) So, I notice up here that
24 you cite additional -- you say since submission of
25 your original report, you have been provided and have

151

1  reviewed the following document, and it is the EMS
2  report; is that right?
3  A. Yes.
4  Q. And is that the only information that you
5  received that you considered in formulating this
6  opinion in your addendum?
7  A. Yes.
8  Q. Okay. Now, what you say here, you provided
9  Summary, and this is taken from the EMS report; is
10 that correct?
11 A. Correct.
12 Q. And so I'd just like to turn to the
13 Discussion. You say "Prior to his death, Mr. Taylor
14 was displaying symptoms of moderate to severe
15 methamphetamine toxicity as manifested by his
16 significant psychomotor agitation, hallucinations, and
17 paranoia." And just -- I think we touched on it
18 earlier, but this is just based on what you have seen
19 in the record; correct?
20 A. Yes.
21 Q. And there was no effort to do any kind of
22 differential diagnosis because -- well, could you even
23 do a differential diagnosis of him at this point?
24 A. Based on what I saw in the record?
25 Q. Yes.

152

1  A. I mean, certainly I have a differential
2  diagnosis that -- but it's difficult to kind of rule
3  things out or rule things in based on not seeing
4  Mr. Taylor.
5  Q. Okay. And not having things like labs, for
6  example?
7  A. Right.
8  Q. Okay. So, you talk about hyperthermia,
9  which we discussed. You say it's a "well-known and
10 treatable complication of methamphetamine toxicity
11 which can itself lead to respiratory failure, cardiac
12 failure seizures, kidney injury, and sever electrolyte
13 imbalance, which can ultimately result in PEA and
14 death." What is PEA?
15 A. PEA is an acronym for pulseless electrical
16 activity.
17 Q. And how does hyperthermia cause PEA?
18 A. So, hyperthermia can lead to these
19 complications. You can become acidemic, you -- which
20 can lead to PEA. You can have rhabdo, become
21 hyperkalemic, kidney failure, and they can all lead to
22 a pulseless electrical activity.
23 Q. And so, that was the condition Mr. Taylor
24 was in when the EMTs came?
25 A. Yes, as far as I know.

153

1  Q. And does PEA indicate any kind of cardiac
2  event happening, in your experience?
3  A. So, PEA is a lot of different etiologies.
4  It can be cardiac. Cardiac can also cause ventricular
5  fibrillation and ventricular tachycardia.
6  Q. So, just knowing that somebody is found in a
7  state of PEA, there's no way to tell necessarily what
8  is causing the PEA?
9  A. No. So, if somebody is in the hospital you
10 go through something called your Hs and Ts. You think
11 of -- for H -- and this is not exhaustive -- there is
12 hypoxemia, there's, you know, hyperthermia. For Ts
13 there's thrombosis, there's tension pneumothorax. So
14 there are multiple things can cause PEA, and it's
15 difficult to determine exactly which one caused it
16 without doing a more thorough evaluation.
17 Q. So, down here you say "It is my opinion to a
18 reasonable degree of medical certainty that
19 Mr. Taylor's hours-long period of psychomotor
20 agitation, described as kicking, punching, yelling and
21 pacing, while being contained in a cell described by a
22 medical professional as," quote, "like a sauna," end
23 quote, "placed Mr. Taylor at a very high risk for
24 severe methamphetamine-associated hyperthermia, which
25 is life threatening but treatable with timely and

production@litsupport.com    Bean & Associates, Inc. 201 Third Street NW, Ste. 1630, Albuquerque New Mexico 87102    505.843.9494

Exhibit C