IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MINNIE TAYLOR, Individually and as
Personal Representative of the ESTATE OF
LOUIE TAYLOR, and HAROLD CUTHAIR,

        Plaintiffs,

      v.                                            No. 21-cv-00613-GJF-JFR

THE UNITED STATES OF AMERICA,

        Defendant.

**DEFENDANT UNITED STATES' PARTIAL MOTION FOR SUMMARY JUDGMENT
ON LOSS OF CONSORTIUM CLAIMS AND MEMORANDUM IN SUPPORT**

The Court should grant summary judgment for the United States and dismiss Plaintiffs' claims for loss of consortium (Count IV). The decedent, Louie Taylor, was 33 years old at the time of his death. "The New Mexico courts have never recognized a loss-of-consortium claim arising from a relationship between a parent and an adult child." *Williams v. Bd. of Regents of the Univ. of New Mexico*, No. CIV 13-0479 JB/WPL, 2014 WL 4351533, at *18 (D.N.M. Aug. 18, 2014). Even if such a claim were cognizable, the New Mexico courts would require "a level of mutual dependence that is well out of the ordinary for such relationships." *Id*. Although Mr. Taylor still lived with his mother, Plaintiff Minnie Taylor, their relationship did not rise to the extraordinary level of mutual dependence required under New Mexico law to recover for loss of consortium. Mr. Taylor's relationship with his father, Plaintiff Harold Cuthair, was even less close than his relationship with his mother. Accordingly, there is no genuine issue of material fact warranting a trial on Plaintiffs' loss of consortium claims, and summary judgment is appropriate. *See* Fed. R. Civ. P. 56.

The undersigned notified Plaintiffs' counsel of this motion, and Plaintiffs are opposed.

# DEFENDANT'S UNDISPUTED MATERIAL FACTS ("UMFs")

### A. Mr. Taylor's Childhood

1. Plaintiffs' son, Louie Taylor, was born in December of 1986 and passed away on or about February 29, 2020. *See* Pls.' Responses to Def.'s First Set of Written Discovery, attached as Ex. A, at 2; Doc. 1 ¶ 1.

2. Mr. Taylor was born and raised in Shiprock, New Mexico. Ex. A at 2-3.

3. Plaintiffs Taylor and Cuthair never married and separated in 1993. Dep. of Minnie Taylor, attached as Ex. B, at 14:1-4; Dep. of Harold Cuthair, attached as Ex. C, at 16:5-8.

4. From 1985 to 1993, Plaintiff Cuthair worked at a ranch in Towoac, Colorado, performing a "24/7 job," and he mostly stayed with his mother in Towoac or slept in his truck. Ex. C at 15:13-16:4.

5. Because Plaintiff Cuthair was "too busy with [his] employment" at the ranch, he "hardly ever came" to Shiprock to see Louie. *Id*. at 25:2-11.

6. Plaintiff Cuthair visited Louie "every now and then," but Plaintiff Taylor "didn't allow visitation" after the separation. *Id*. at 23:17-21; 23:15-24:14.

7. Plaintiff Taylor considered herself a "single parent with . . . two boys," Louie and his younger brother, Karsten. Ex. B at 14:8-11; 17:8-12.

8. While Plaintiff Taylor worked, her mother would take care of the boys. *Id*. at 62:20-63:6; 63:17-19.

### B. Mr. Taylor's Relationship with His Mother, Plaintiff Taylor, As an Adult

9. At the time of Mr. Taylor's death, he was unemployed and living with his mother in Shiprock. *Id*. at 36:18-20; 52:19-21; Ex. C at 29:22-25.

10. Mr. Taylor's only known income was $2,000 per year and bonuses from the Ute Mountain Ute Tribe. Ex. A at 7; Ex. C at 30:13-22.

11. Mr. Taylor would sometimes buy his mother lunch or groceries, provide her with gas money, and pay the electric bill, presumably from gambling winnings or tribal income, but she could not recall how much money he would give her. Ex. B at 33:16-34:11; 36:12-37:7.

12. Mr. Taylor did not pay his mother rent, and she would sometimes provide him with gas money. *Id*. at 36:21-22; 37:22-23.

13. Mr. Taylor helped clean the house and fed the dogs, but he did not do any cooking and only did his own laundry. If Mr. Taylor bought groceries, his brother would do the cooking. *Id*. at 38:14-24; 39:6-9; 39:15-22; 40:11-15; 41:9-12.

14. Mr. Taylor spent most of his time outside the house to exercise and was "hardly home." *Id*. at 50:19-51:6; 51:25-52:5.

15. Plaintiff Taylor did not accompany her son when he was engaging in his hobbies of gambling and exercise. Ex. B at 53:5-54:25.

16. Mr. Taylor had a lot of friends, but Plaintiff Taylor was unaware of who her son socialized with other than a few friends whose parents she knew. *Id*. at 51:11-18.

17. Although Plaintiff Taylor believed her son never had any health issues, she was unaware that her son had sought treatment for alcohol and cannabis abuse. Ex. A at 4; Ex. B at 56:7-19; 79:18-80:9; 80:24-81:3.

18. Plaintiff Taylor was also unaware that her son had a lengthy record of arrests for intoxication and driving under the influence. Ex. A at 6; Ex. B at 119:25-129:4; 120:21-24.

19. Plaintiff Taylor reported that her son Louie "shared a lot of things together" with his brother, Karsten, and that she "was the last to know" about them. She further testified that she "never got into his personal business." Ex. B at 32:5-8; 36:14-15.

20. Plaintiff Taylor worked until she retired in November 2019. Ex. A at 1; Ex. B at 11:15-18.

21. Since her son's death, Plaintiff Taylor has been seeing a counselor every month and has experienced memory loss, headaches, and chest pain. She treats her headaches with ibuprofen. Ex. A at 5; Ex. B at 176:14-24.

C. **Mr. Taylor's Relationship with His Father, Plaintiff Cuthair, As an Adult**

22. Mr. Taylor would visit his father once or twice a week, text him frequently, and help feed his father's horses. Ex. A at 5; Ex. C at 32:16-23.

23. Mr. Taylor would ask his father for gas money ranging from $20-$100 about once a month. Ex. C at 31:18-32:4.

24. Mr. Taylor would also bump into his father at casinos and would ask him for money to play slots, and his father would give him $20-$100 at a time. However, they would go their separate ways and did not gamble together. *Id*. at 36:22-27:13; 38:24-39:7.

25. Mr. Taylor did not share any of his income from the Ute Mountain Ute Tribe or his gambling winnings with his father. *Id*. at 31:5-7; 40:23-25.

26. Plaintiff Cuthair was unaware of his son's substance abuse or other health issues, nor did he know about his son's arrest history. Ex. A at 4, 6; Ex. C at 44:7-9; 44:25-45:8.

27. Plaintiff Cuthair did not know who his son's friends were and did not know what his son liked to eat. Ex. C at 42:23-43:3.

28. After his son's death, Plaintiff Cuthair did not seek any mental health treatment or counseling, nor did he require any medications. *Id.* at 49:15-20.

## APPLICABLE LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is no issue for trial unless there is sufficient evidence to support a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Initially, the moving party has the burden of demonstrating the absence of any issues of material fact. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). The moving party may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim. *See* Fed. R. Civ. P. 56(c)(1)(B); *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

If the moving party meets its burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to the elements essential to the non-moving party's claims. *Shapolia*, 992 F.2d at 1036. In attempting to establish the existence of a material factual dispute, the opposing party may not rely upon mere allegations in the pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a material factual dispute exists. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, n.11 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient. *Anderson*, 477 U.S. at 252. "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50.

If the nonmoving party fails to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *See Celotex Corp.*, 477 U.S. at 322-23. The moving party is therefore entitled to a judgment as a matter of law. *Id.*

## ARGUMENT

I. **A Loss of Consortium Claim Requires Both (1) a Sufficiently Close Relationship Between the Claimant and Decedent and (2) Foreseeability of Harm to the Claimant.**

The New Mexico Supreme Court first recognized loss of consortium as a cause of action in 1994 in the context of married spouses. *See Romero v. Byers*, 117 N.M. 422, 872 P.2d 840 (1994). Since then, the New Mexico Supreme Court has allowed loss of consortium claims in other contexts, including grandparents of a minor grandchild, *see Fernandez v. Walgreen Hastings Co.*, 126 N.M. 263, 968 P.2d 774 (1998), and unmarried cohabitants, *see Lozoya v. Sanchez*, 133 N.M. 579, 66 P.3d 948 (2003), *abrogated on other grounds by Heath v. La Mariana Apartments*, 143 N.M. 657, 180 P.3d 664 (2008). The New Mexico Court of Appeals has also refused to foreclose the availability of loss of consortium in other contexts, including parents and siblings of a deceased adult, but it has not found the relationships in the particular cases sufficiently close to merit recovery. *See Fitzjerrell v. City of Gallup*, 134 N.M. 492, 79 P.3d 836 (Ct. App. 2003); *Wachocki v. Bernalillo Cnty. Sheriff's Dep't*, 147 N.M. 720, 228 P.3d 504 (Ct. App. 2009), *aff'd*, 150 N.M. 650, 265 P.3d 701 (2011); *Silva v. Lovelace Health Sys., Inc.*, 2014-NMCA-086, ¶ 41, 331 P.3d 958, 968.

Before 1994, the New Mexico Supreme Court held that parents of an adult child could not maintain a claim for loss of consortium because a tortfeasor could not foresee that injury to the adult child would cause harm to the parents. *See Solon v. WEK Drilling Co., Inc.*, 113 N.M. 566,

829 P.2d 645 (1992). Although *Solon* "has not been overruled," this Court has recognized that New Mexico courts probably would not foreclose such a claim as a matter of law. *Williams*, 2014 WL 4351533, at *15, *17; *see also Nez v. United States*, 367 F. Supp. 3d 1245, 1272 (D.N.M. 2019) ("While a loss of consortium claim based on a relationship between an adult child and a parent has not been recognized in New Mexico courts have declined to 'foreclose, as a matter of law,' the possibility of recovery for different types of relationships other than those already recognized." (quoting *Wachocki*, 228 P.3d at 518)). Hence, for purposes of this Motion for Summary Judgment, Defendant will assume that Plaintiffs' loss of consortium claims are cognizable under New Mexico law. *See Holley v. Evangelical Lutheran Good Samaritan Soc'y*, No. CIV 12-0320 KBM/WDS, 2012 WL 12902722, at *4 (D.N.M. June 8, 2012) (recognizing loss of consortium claim of parent of an adult decedent); *accord Duran v. United Tactical Sys., LLC*, — F. Supp. 3d —, No. 1:18-CV-01062 MIS/LF, 2022 WL 474077, at *9 (D.N.M. Feb. 16, 2022) (recognizing loss of consortium claims of adult children of decedent).

## II. Plaintiffs Cannot Show a Mutually Dependent Relationship with Their Son.

"A loss-of-consortium claimant must demonstrate two elements in order to recover damages. The first element is that the claimant and the injured party shared a sufficiently close relationship. . . . The second element is a duty of care" that exists because "it is foreseeable that the harm inflicted upon the injured party would damage the relationship between the injured party and the claimant." *Wachocki*, 265 P.3d at 702 (citations omitted).

In *Lozoya*, the New Mexico Supreme Court listed eight factors to consider in determining whether a relationship is sufficiently close to permit a loss of consortium claim:

> (i) the duration of the relationship, (ii) the degree of mutual dependence, (iii) the extent of common contributions to a life together, (iv) the extent of shared experience, (v) whether the plaintiff and the injured person were members of the same household, (vi) their emotional reliance on each other, (vii) the particulars of

> their day to day relationship, and (viii) the manner in which they related to each other in attending to life's mundane requirements.

*Williams*, 2014 WL 4351533, at *11 (quoting *Lozoya*, 66 P.3d at 957 (brackets omitted)). Since *Lozoya*, the New Mexico Supreme Court has acknowledged that "the analysis should be streamlined to accommodate different types of relationships," but that "mutual dependence is the key factor in determining whether the claimant shared a sufficiently close relationship with the injured party." *Wachocki*, 265 P.3d at 704. "A relationship that creates a compensable interest is one that is intimate, protective, interdependent, and intertwined in functional (the way the people in the relationship meet day-to-day situations together), financially interdependent, and temporal ways (spending time together at least to the extent of living together in the same household)." *Duran*, 2022 WL 474077, at *5.

This Court has found a parent-adult child relationship insufficiently close to support a loss of consortium claim where the adult daughter served as the mother's caretaker for ten years and shared a room with her, but the mother depended on her daughter's support for only isolated activities and was otherwise independent. *See Nez*, 367 F. Supp. 3d at 1273-74. Likewise, the New Mexico Court of Appeals held that an adult decedent did not have a mutually dependent relationship with her parents despite evidence that "Decedent's relationship with her parents was extremely close," "Decedent had breakfast with her father twice a week," "she kept a bedroom at her parents' house and stayed there every weekend," and "when Decedent had free time she spent it with her parents." *Silva*, 331 P.3d 958, 968. The Court of Appeals concluded that the decedent "was not a member of her parents' household," "was not involved in her parents' day-to-day decisions or fulfillment of everyday requirements," and that "significant support from her parents as well as the enjoyment of frequent meals and visits . . . do not qualify as mutual dependence." *Id*.

By contrast, this Court has found a triable issue where the adult daughter saw or spoke with her father daily, lacked close relationships outside her immediate family, worked a night shift so that she could help her father during the day, shared routine household responsibilities with her father, and relied on him to help with car issues and advice on important life decisions. *See Duran*, 2022 WL 474077, at *7. Because the daughter in *Duran* "spent substantial, meaningful time with her father on a daily basis," "depended on her father for daily needs (and vice-versa)," and "actively participated in his wellbeing and care," the Court held that she satisfied the standards for loss of consortium under New Mexico law. *See id*. at *8. Similarly, the Court in *Duran* found that the brother also had a mutually dependent relationship with his father where he lived at home his entire life, never had to pay rent or buy his own food, took care of his parents, drove them when they could no longer drive, paid his parents' bills and contributed to the cost of food, stopped working in order to take care of his parents, relied on his father's advice for important life decisions, and spent time with his father engaged in mundane activities such as watching television, listening to music, and talking about the news. *See id*.

Here, Plaintiff Taylor's relationship with her son, while undoubtedly close and loving, does not rise to the level of mutually dependent. Although Mr. Taylor lived with his mother rent free, contributed to some limited chores, and sometimes paid for groceries and bills, he did not serve as her caretaker, and she was still working until retiring a few months before his death. UMFs 9, 11-12, 20. She testified that her son was hardly at home, had an active social life, and spent his time on hobbies that she did not participate in. UMFs 14-16. Mr. Taylor also did not confide in his mother, and she did not ask him about his personal matters. UMF 19. Indeed, Mrs. Taylor was unaware of her son's medical conditions such as substance abuse or the extent of his criminal record. UMFs 17-18. Although Mr. Taylor did not work, UMF 9, there is no evidence that he made

9

a conscious decision not to work so that he could stay at home and provide services to his mother. In sum, their relationship did not involve spending substantial, meaningful time together every day, depending on each other for their daily needs, or actively participating in each other's well-being or care.

Mr. Taylor's relationship with his father was even less close than with his mother. Plaintiff Cuthair was largely absent from Mr. Taylor's life while he was growing up. UMFs 4-7. While Mr. Taylor visited his father once or twice a week and they texted frequently, he did not provide any services to his father other than feeding the horses. UMF 22. Both enjoyed a hobby of gambling at casinos, yet they did not actually spend any time together gambling even when at the same casino at the same time. UMF 24. Plaintiff Cuthair was unaware of his son's medical or arrest history, and he did not know who his son's friends were or even what his son liked to eat. UMFs 26-27. Mr. Taylor frequently requested and obtained money from his father for gas or gambling, but there is no evidence that he reciprocated with any financial support to his father. UMFs 23-25. Accordingly, the evidence suggests that, if anything, Mr. Taylor "was *unilaterally* dependent" on Plaintiff Cuthair, rather than that they were *mutually* dependent on each other. *Williams*, 2014 WL 4351533, at *22 (emphasis added).

Because a parent-adult child relationship "must exhibit a level of mutual dependence which rises far above the norm," *id*., Plaintiffs fall short of the mark required to support a claim for loss of consortium under New Mexico law. Therefore, the Court should grant summary judgment on their claims.

**III. Plaintiffs Taylor and Cuthair Cannot Show That It Was Foreseeable That Mr. Taylor's Death Would Injure Their Relationship.**

Because Plaintiffs cannot satisfy the first prong of the loss of consortium standard, the Court need not reach the foreseeability prong. *See Nez*, 367 F. Supp. 3d at 1274. However, even if

the Court considers this prong, Plaintiffs also cannot satisfy it. While it appears that this Court no longer relies on *Solon*'s foreseeability holding to bar all loss of consortium claims by parents of an adult decedent, *see Duran*, 2022 WL 474077, at *6 n.11; *Williams*, 2014 WL 4351533, at *17, this Court has relied on all or most of the following factors adapted from *Fernandez* to support a finding of foreseeability: "(1) the decedent was an elderly family member; (2) Plaintiff was a familial care-taker, who lived with, and cared for, the decedent for a significant period of time prior to the injury or death; (3) the decedent was seriously physically injured or killed; and (4) Plaintiff suffered emotional injury as a result of the loss of the decedent's companionship, society, comfort, aid, and protection." *Duran*, 2022 WL 474077, at *8.

Here, the decedent was a 33-year-old man. While he lived with his mother for a significant time period, he had no caregiving responsibilities for either parent and vice versa. Unlike the children in *Duran*, there is no evidence that Mr. Taylor's life was "consumed by the responsibility of helping" either parent as they aged, that he "gave up personal opportunities (including job opportunities) to be with [either parent] on a daily basis," and that his "obligations to [either parent] were a defining component" of his life. *Id*. Consequently, the evidence does not create a triable issue that the harm to Plaintiffs' relationship with their son was sufficiently foreseeable to support their loss of consortium claims. Summary judgment is therefore appropriate on these claims based on the second prong.

## **CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment on Count IV.

Respectfully submitted,

FRED J. FEDERICI
United States Attorney

*/s/ Christine H. Lyman 5/4/2022*
CHRISTINE H. LYMAN
Assistant United States Attorney
District of New Mexico
P.O. Box 607
Albuquerque, NM 87103
505-346-1532
Christine.Lyman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2022, Defendant United States filed through the United States District Court CM/ECF System the foregoing document, causing it to be served by electronic means on all counsel of record.

*/s/ Christine H. Lyman 5/4/2022*
CHRISTINE H. LYMAN
Assistant United States Attorney