IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MINNIE TAYLOR, Individually and as
Personal Representative of the ESTATE OF
LOUIE TAYLOR, and HAROLD CUTHAIR,

       Plaintiffs,

       v.                                                                                                                                                     No. 21-cv-00613-GJF-JFR

THE UNITED STATES OF AMERICA,

       Defendant.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant United States of America, by its undersigned counsel, respectfully moves this Court for summary judgment. Plaintiffs allege that their son, Louie Taylor, died due to the failure of police and corrections officers to obtain a medical clearance exam[1] before arresting and detaining him for disorderly conduct. They contend that a medical clearance exam would have revealed that Mr. Taylor was suffering from a complication of methamphetamine intoxication, and that he could have been successfully treated for that complication. Consequently, Plaintiffs bring claims of negligence, loss of chance,[2] and loss of consortium.[3]

---

[1] In this Motion, the term "medical clearance exam" will be used to denote a medical examination by a healthcare provider to determine whether a person can be arrested or detained without further treatment.

[2] Defendant has concurrently filed a motion to dismiss the loss of chance claim for lack of subject matter jurisdiction as well as a partial motion for summary judgment on the negligence and loss of chance claims based on the discretionary function exception. The Court should resolve those motions first. *See Valenzuela v. Silversmith*, 699 F.3d 1199, 1204-05 (10th Cir. 2012) (("The Supreme Court has instructed that federal courts may not assume they have subject matter jurisdiction for the purpose of deciding claims on the merits.").

[3] Defendant has concurrently filed a motion for summary judgment on the loss of consortium claim.

The Court should grant summary judgment on the negligence and loss of chance claims. To prevail on both claims, Plaintiffs bear the burden of proving the elements of duty, breach, damages, and causation. *See Alberts v. Schultz*, 1999-NMSC-015, ¶ 17, 975 P.2d 1279, 1284. Plaintiffs' claims fail because they cannot raise a triable issue as to causation, which requires a medical expert opinion that the purported breach of the standard of care caused Mr. Taylor's death. As Defendant argues in its concurrently filed motion to exclude opinions and testimony of Plaintiff's experts, Dr. Virginia Harvey and Cameron Lindsay, Dr. Harvey is not qualified to opine on whether postmortem toxicological results indicate that Mr. Taylor could have survived if given a medical clearance exam, and Mr. Lindsay is not qualified to opine that the police and corrections officers' failure to obtain a medical clearance exam caused Mr. Taylor's death. Absent any expert testimony, Plaintiffs cannot show to a reasonable degree of medical probability that Defendant's employees caused Mr. Taylor's death or loss of chance of survival.

Even if the Court considers these experts' opinions, it should still grant summary judgment on the negligence and loss of chance claims. Dr. Harvey does not causally link any act or omission of any police or corrections officer with Mr. Taylor's death or lost chance for survival. Nor does she show that the provision of a medical clearance exam—the only intervention she cites as potentially lifesaving in this case—would have prevented Mr. Taylor's death. The only expert who purports to link any breach by Defendant to causation is Mr. Lindsay, whose opinion is insufficient because he cannot testify to a reasonable degree of *medical* probability.

If the Court grants summary judgment on the negligence and loss of chance claims, the loss of consortium claim fails as a matter of law, and the Court should dismiss the entire action.

The undersigned notified Plaintiffs' counsel of this motion, and Plaintiffs are opposed.

**DEFENDANT'S UNDISPUTED MATERIAL FACTS ("UMFs")**

**A.     The Events Leading up to Mr. Taylor's Death**

1.     On Friday, February 28, 2020, Plaintiff Minnie Taylor traveled with her son, Louie Taylor, from Shiprock to Albuquerque to visit Louie's brother, Karsten. Dep. of Minnie Taylor, attached as Ex. A, at 129:10-14.

2.     During the trip, Louie was acting strange, including talking about aliens, causing his mother and brother to be concerned about his health. Karsten repeatedly asked Louie if he was taking drugs, but Louie denied any drug use and refused their offers to take him to the hospital. *Id*. at 130:24-131:25; 133:7-11; 136:14-137:18; 138:8-21.

3.     On the evening of February 29, 2020, after they had returned to Shiprock, Plaintiff Taylor called the police repeatedly to ask for their help to deal with her son, who was intoxicated. Def.'s Fourth Supplemental Responses to Pls.' First Set of Written Discovery, attached as Ex. B, at 1.

4.     Mr. Taylor fled the scene before Navajo Nation Police Sgt. Francis Yazzie responded to the Taylor residence. *Id*.

5.     Shortly after 8 p.m., the Northern Navajo Medical Center ("NNMC") Emergency Medical Services ("EMS") Office contacted Navajo Nation police dispatch to report that a male subject, who turned out to be Mr. Taylor, was banging on the hospital doors and causing a disturbance. *Id*. at 2.

6.     Mr. Taylor was let into the emergency department through the ambulance bay doors, and a health tech in the triage area instructed him to go to the waiting area outside the emergency department to wait to be triaged. *Id*. at 1.

7. When Police Officer Danielle Murdock responded to NNMC, security guards surrounded Mr. Taylor, who was sitting in the waiting area talking about an alien invasion. *Id*. at 2.

8. Because the hospital staff never communicated to Officer Murdock that Mr. Taylor was waiting to be triaged, he was detained before the hospital could triage or examine him. *Id*. at 1-2.

9. Mr. Taylor was booked into the Shiprock Jail and did not request or receive medical attention. *Id*. at 2.

10. The booking officer noted on an intake screening form that he appeared to be on drugs and claimed to be seeing aliens. *Id*.

11. During the evening, the corrections officers who periodically checked on Mr. Taylor reported that he was pacing, yelling, and banging on the door. *Id*. at 3.

12. Just after midnight on March 1, 2020, a corrections officer found Mr. Taylor sitting on the floor of his cell unresponsive. *Id*.

13. EMS arrived at the jail and transported Mr. Taylor to Northern Navajo Medical Center, where he was pronounced dead. *Id*.

14. Plaintiffs raise claims of negligence and loss of chance based on the police and corrections officers' failure to obtain a medical clearance exam for Mr. Taylor prior to arresting and booking him. Doc. 1 ¶¶ 40-46, 53-54. They further assert a claim for loss of consortium. *Id*. ¶¶ 55-56.

B. **Plaintiffs' Medical Expert, Dr. Virginia Harvey**

15. Plaintiffs disclosed a single medical expert, Dr. Virginia Harvey, to opine on "whether Mr. Taylor's life could have been saved if he had received proper, timely medical intervention." *See* Pls.' Expert Disclosures, attached as Ex. C, at 1.

16. Dr. Harvey will not opine on what actually caused Mr. Taylor's death but will rely on the findings of the medical examiner who performed an autopsy. *See* Dep. of Dr. Harvey, attached as Ex. D, at 25:3-5; 25:13-26:12; *see also* Expert Report of Dr. Harvey, attached as Ex. E, at 2.

17. Dr. Harvey also will not opine on whether the conduct of any particular person caused or contributed to Mr. Taylor's death. *See* Ex. D at 26:13-17.

18. In her expert report, Dr. Harvey opines "to a reasonable degree of medical certain[t]y that had Mr. Taylor been afforded timely and appropriate medical care, it is likely the toxic effects of methamphetamine could have been discovered and treated, thereby preventing his death." Ex. E at 4.

19. Dr. Harvey's report does not explain what "timely" medical care means. *See generally* Ex. E. She later testified that "any time prior to his cardiac arrest would have been good." Ex. D at 148:18-149:6.

20. Dr. Harvey did not receive any information about what occurred prior to 7:48 pm on February 29, 2020, when the police were first dispatched to the Taylor residence, and is therefore unaware that Mr. Taylor first began displaying symptoms of potential methamphetamine toxicity such as hallucinations on February 28, 2020. *Id*. at 24:2-15; 149:7-150:2.

21. Although Dr. Harvey is aware that Mr. Taylor was at Northern Navajo Medical Center when he was detained, she will not provide an opinion about the conduct of anyone at the

hospital in allowing him to be detained and removed from the hospital before he could be examined. *Id*. at 179:7-10.

22. Dr. Harvey will testify that the specific intervention Mr. Taylor should have received was a medical clearance exam by a physician or other health care provider, which would involve taking a medical history and vital signs and releasing him for booking if the examiner determined there were no acute medical conditions. *Id*. at 85:7-86:10; 143:17-144:23.

23. According to her expert report, "[p]atients who present for treatment of moderate to severe methamphetamine toxicity are typically evaluated for one or more of many potentially life-threatening complications, which include, but are not limited to, elevated body temperature (hyperthermia), seizures, strokes, abnormal heart rhythms, heart attacks, damage to major blood vessels, severe hypertension, kidney failure, and electrolyte abnormalities." These evaluations include measurements of vital signs, taking of patient history, and a physical exam, followed by "an EKG and/or a series of laboratory and radiological studies" if warranted by the initial assessment. Ex. E at 3.

24. Dr. Harvey characterizes these complications of methamphetamine toxicity as "largely treatable." *Id*. at 4. However, she admits that she does not know which, if any, of these complications Mr. Taylor may have experienced or whether the complication would have been treatable had he received a medical clearance exam. Ex. D at 25:18-26:1; 145:2-25; 170:25-171:14.

25. Dr. Harvey concedes that (1) her report overlooked a known complication of methamphetamine toxicity, sudden cardiac arrest, (2) a sudden cardiac event can occur even if a patient receives timely medical intervention, and (3) the chance of death from a sudden cardiac arrest is "high" even for patients who arrest in the hospital. *Id*. at 159:17-19; 162:11-163:6; 165:7-166:9.

26. Dr. Harvey opines in a supplemental expert report that Mr. Taylor was "at very high risk for severe methamphetamine-associated hyperthermia, which is life-threatening, but treatable with timely and quality medical care." Dr. Harvey Addendum, attached as Ex. F, at 2.

27. However, Dr. Harvey admits that she does not base this opinion on any clinical or autopsy findings, but rather on an EMS report that described the cell as feeling "like a sauna" upon arrival at the jail at 12:12 a.m., and that there is no way to confirm whether Mr. Taylor was actually suffering from severe methamphetamine-associated hyperthermia or merely "could have had it." Ex. D at 155:17-156:6; 156:16-157:24.

C. **Plaintiffs' Corrections Expert, Cameron Lindsay**

28. Plaintiffs also disclosed a corrections expert, Cameron Lindsay, to opine on "the events that occurred before, during, and after Mr. Taylor's incarceration until his death." Ex. B at 1.

29. Although Mr. Lindsay has no medical training and is not a medical expert, he will opine "to a reasonable degree of professional certainty" that "Mr. Taylor died because he did not receive medical treatment" as a result of the corrections officers' alleged departures from minimal jail standards of care. Cameron Lindsay Dep., attached as Ex. G, at 30:1-31:2; Cameron Lindsay Report, attached as Ex. H, at 2-3.

30. However, Mr. Lindsay will not testify that medical intervention would have saved Mr. Taylor, and he did not rely on Dr. Harvey's opinions. Ex. G at 147:16-148:18.

**APPLICABLE LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is no issue for trial unless there

is sufficient evidence to support a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Initially, the moving party has the burden of demonstrating the absence of any issues of material fact. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). The moving party may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim. *See* Fed. R. Civ. P. 56(c)(1)(B); *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

If the moving party meets its burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to the elements essential to the non-moving party's claims. *Shapolia*, 992 F.2d at 1036. In attempting to establish the existence of a material factual dispute, the opposing party may not rely upon mere allegations in the pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a material factual dispute exists. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, n.11 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient. *Anderson*, 477 U.S. at 252. "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id*. at 249-50.

If the nonmoving party fails to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *See Celotex Corp.*, 477 U.S. at 322-23. The moving party is therefore entitled to a judgment as a matter of law. *Id.*

**ARGUMENT**

I.  **To Prove Causation for the Negligence and Loss of Chance Claims, Plaintiffs Need Medical Expert Evidence.**

"State substantive law applies to suits brought against the United States under the FTCA." *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1117 (10th Cir. 2004). In New Mexico, "a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86. A "medical causation question . . . ordinarily must be established by expert medical testimony." *Cano v. Smith's Food King*, 1989-NMCA-080, ¶ 5, 781 P.2d 322, 323; *see also Smith v. Auto-Owners Ins. Co.*, No. 15-CV-1153 SMV/GBW, 2017 WL 3223952, at *2 (D.N.M. July 27, 2017) ("Under New Mexico law, it is well-settled that the plaintiff bears the burden of proof on medical causation, and he cannot prevail on the issue of medical causation without expert testimony directly supporting his conclusion.").

In cases involving in-custody death, a medical expert is required to connect a breach of the standard of care to the death where the cause of death is outside the knowledge of a lay juror. *See, e.g.*, *Shivner v. CorrValues, LLC*, No. CIV 20-0497 RB/CG, 2022 WL 1014978, at *12-*13 (D.N.M. Apr. 5, 2022) (holding that "Plaintiff is required to present expert testimony to connect [the decedent's] medical conditions and death to [the jail contractor's] decisions regarding his treatment and transfer," as well as to show that the decedent's "condition was made worse by a delay caused by a [jail contractor]"); *Valdez-Barela v. Corr. Corp. of Am. & Corizon Health, Inc.*, No. A-1-CA-37384, 2019 WL 3766391, at *3 (N.M. Ct. App. July 16, 2019) (holding that a medical expert was required to show that an inmate's use of drugs supplied by corrections officers was a contributing factor to his suicide). Similarly, courts require medical expert testimony in

9

negligence claims involving drug overdoses. *See, e.g.*, *Bevan v. Valencia*, No. CV 15-73 KG/SCY, 2017 WL 4797788, at *4 (D.N.M. Oct. 24, 2017) (granting summary judgment where the plaintiff failed to provide "expert testimony stating, to a reasonable degree of medical probability," that a hospital's failure to have a policy on treating heroin overdoses, resulting in alleged premature discharge and clearance for incarceration, proximately caused the decedent's in-custody death).

"[A] lost-chance claim may be conceived of as the loss of a window of time" during which "proper medical intervention" would have avoided or minimized the injury. *Alberts*, 975 P.2d at 1285, 1287. The elements of a loss of chance claim—"duty, breach, loss or damage, and causation"—are the same as the elements of a negligence claim. *Id.* at 1284. The only difference is "the nature of the harm for which relief is sought." *Id*. In a loss of chance claim, the "compensable injury" is "the destruction of the chance of survival," but in a negligence claim, the injury is "the death as such." *Baer v. Regents of Univ. of California*, 1999-NMCA-005, ¶ 10, 972 P.2d 9, 12. Hence, under the loss of chance theory of negligence, "the standard for causation remains the same but the injury is redefined," and a plaintiff's recovery is limited to "only a percentage of the value of the entire life." *Id*.

"Because the issues raised in lost-chance actions are, in virtually every case, beyond the province of lay persons, the plaintiff will almost always establish these elements through expert testimony." *Alberts*, 975 P.2d at 1284 (internal quotation marks omitted). Even assuming a loss of chance cause of action is cognizable outside the medical malpractice context, "Plaintiff would be required to establish *through a medical expert* that Defendant's failure to initiate emergency response caused the loss of a chance of survival." *Zia Tr., Inc. v. Aragon*, 2011-NMCA-076, ¶ 17, 258 P.3d 1146, 1151 (emphasis added). Hence, in a loss of chance case, the plaintiff "must show to a reasonable degree of medical probability that the defendant's negligence caused the loss of

10

the chance of a better result." *Alberts*, 975 P.2d at 1286. "The burden of proving reasonable medical probability rests with the plaintiff, and a causal connection between the alleged act of malpractice and the plaintiff's loss or damages cannot be substantiated by arguments based upon conjecture, surmise, or speculation." *Id.* at 1288.

Accordingly, to establish an essential element of both their negligence and loss of chance claims, Plaintiffs must offer expert testimony to a reasonable degree of medical probability that Defendant's alleged breaches in the standard of care caused Mr. Taylor's death or a loss of the chance of a better result.

## II. If the Court Grants Defendant's Motion to Exclude, Plaintiffs Cannot Establish Causation.

Plaintiffs have disclosed only one medical expert in this case, Dr. Virginia Harvey. UMF 15. Consequently, if the Court grants Defendant's motion to exclude Dr. Harvey, Plaintiffs will have no witness who is qualified to testify to a reasonable degree of medical probability that Defendant's acts or omissions caused Mr. Taylor's death or a loss of chance of survival. Absent a medical expert, Plaintiffs cannot establish an essential element of their negligence and loss of care claims, and summary judgment is appropriate. *See Badonie v. United States*, No. CV 05-1205 MCA/WPL, 2007 WL 9734057, at *4 (D.N.M. June 25, 2007) (noting that when expert testimony is required to prove an element of the plaintiff's claim, "a showing by the defendant that the plaintiff lacks an expert witness is sufficient to support a motion for summary judgment").

## III. Even If the Court Denies Defendant's Motion to Exclude, Plaintiffs Cannot Establish Causation.

Even if the Court denies Defendant's motion to exclude Dr. Harvey, Plaintiffs still cannot raise a triable issue as to causation because no expert in this case will testify to a reasonable degree of medical certainty that any breach of the standard of care applicable to Defendant caused Mr. Taylor to die or lose his chance for survival.

Dr. Harvey will testify that a "timely" medical clearance exam would have likely led to the discovery and treatment of a methamphetamine-related complication that she is assuming caused Mr. Taylor's death. UMFs 18, 22. However, even though Mr. Taylor was already at the hospital waiting to be triaged, Dr. Harvey will not provide any testimony about the conduct of the hospital staff in contacting the police and allowing him to be detained without communicating the need for him to be triaged. UMF 21. Even if Mr. Taylor had received the medical clearance exam, Dr. Harvey cannot say which of the many possible complications of methamphetamine intoxication would have been uncovered or what Mr. Taylor's chances of survival would have been after the exam. UMF 24. She can only speculate that he "*could* have had" severe hyperthermia, which is "life-threatening, but treatable." UMFs 26-27 (emphasis added). Nor can she identify any particular window of time when a medical clearance exam could have saved Mr. Taylor's life, other than to say that "any time prior to his cardiac arrest would have been good." UMF 19. Given that Mr. Taylor was showing signs of methamphetamine intoxication the day before his arrest and detention, Dr. Harvey's opinion overlooks a large swath of time before 7:48 p.m. on February 29, 2020, when Mr. Taylor might have benefited from a medical clearance exam.[4] UMFs 1-2, 20.

Courts in New Mexico routinely reject speculative causation opinions. For example, in *Zia Trust*, the New Mexico Court of Appeals considered a medical expert's opinion that "if there had been an immediate call to EMS at the time of the traumatic event, there could have been an increased likelihood of survival of 25%." 258 P.3d at 1150 (internal quotation marks omitted). Because the expert "lacked significant information concerning Decedent's internal injuries and

---

[4] By providing Dr. Harvey with a truncated version of events, Plaintiffs have artificially shrunk the window of time when Mr. Taylor could have been saved. The period of time before Mr. Taylor's arrest and detention is important because loss of chance damages are awarded "on a proportional basis as determined by the percentage value of the patient's chance for a better outcome prior to the negligent act." *Alberts*, 975 P.2d at 1287.

cause of death" due to the lack of an internal autopsy, the Court concluded that "the jury would have been required to speculate as to the extent of Decedent's injuries and cause of death in order to determine Decedent's chance of survival." *Id*. at 1152. Here, while Dr. Harvey does have the benefit of an internal autopsy, she cannot point to any autopsy findings to support the presence of any of the "life-threatening, but treatable" complications cited in her expert report and supplemental report. UMF 27. Hence, the Court would have to speculate as to what complication caused Mr. Taylor's death and what his chances of survival would have been had he received a medical clearance exam. Speculation, however, is insufficient to establish causation under New Mexico law. *See Alberts*, 975 P.2d at 1288.

Likewise, in *Garcia v. Bd. of Cnty. Comm'rs of Bernalillo Cnty*., No. 09-cv-322-BB-WDS, 2012 WL 13081238 (D.N.M. Feb. 22, 2012), this Court rejected a medical expert's opinion that "in general practice, certain tests may reveal certain symptoms of heart problems," since the expert could not say whether the decedent "likely exhibited any such symptoms" that would have been detected had the tests been performed. *Id*. at *3. According to the Court, the expert's opinion that "one can only imagine what further testing might have revealed" did not satisfy the plaintiffs' burden to "show that proper care would have likely le[d] to a diagnosis" for the decedent. *Id*. Furthermore, absent evidence that there was an available treatment, "the patient was a suitable candidate for that treatment," and "the treatment would have likely been effective in that case," the Court held that the plaintiffs failed to satisfy their "burden to show that diagnosis could lead to beneficial treatment." *Id*. at *4. Here, Dr. Harvey also provides a generalized opinion that testing performed during a medical clearance exam could have unearthed symptoms of a "life-threatening, but treatable" complication but cannot say that Mr. Taylor had such symptoms or could have been successfully treated. UMFs 24, 27. Indeed, Dr. Harvey admits that she overlooked a known

13

complication—sudden cardiac arrest—that is largely unsurvivable even when it occurs in a hospital setting. UMF 25. Hence, her opinion is essentially the same as the one this Court rejected in *Garcia*: one can only imagine what a medical clearance exam might have revealed.

Plaintiff's evidence of causation also fails because Dr. Harvey does not purport to connect any particular acts or omissions with Mr. Taylor's death. UMFs 17, 21. Because neither of Dr. Harvey's reports contains opinions about the conduct of any hospital, police, or corrections employees, *see generally* Exs. E-F, she cannot offer any new opinions at trial about their conduct and any causal link to Mr. Taylor's death or lost chance of survival, *see* Fed. R. Civ. P. 26(a)(2)(B)(i); *Dentsply Sirona Inc. v. Edge Endo, LLC*, No. 1:17CV1041-JFB-SCY, 2020 WL 6392764, at *13 (D.N.M. Nov. 2, 2020) ("All expert witnesses at trial must tether their testimony to the contents of their respective reports and are precluded from exceeding the scope of their reports." (internal quotation marks omitted)). Hence, "the Court must infer causation," which is not sufficient to withstand summary judgment. *Garcia*, 2012 WL 13081238, at *3; *see also Hart for Jaramillo v. Corrections Corp. of Am.*, No. 2:11-cv-00267-MCA-WPL, 2014 WL 12689319 (D.N.M. May 6, 2014) (granting summary judgment on loss of chance claim based on delayed diagnosis and treatment by prison medical personnel because the plaintiff's medical expert "did not offer any expert opinion causatively linking Defendant's understaffing" with the delay).

*Bevan v. Valencia* is instructive. There, the plaintiff's medical expert opined that if the decedent had "stayed at the Hospital for a longer period of time she would have 'likely' survived" a heroin overdose rather than dying in custody. 2017 WL 4797788, at *4. However, the Court noted that this opinion failed to establish to a reasonable degree of medical probability that the alleged breach of the standard of care—*i.e.*, the lack of a policy on treatment of heroin overdose patients—proximately caused the decedent's death because it required speculation that a policy

would have resulted in additional observation that would have prevented her death. *Id*. Here, Dr. Harvey similarly opines that if Mr. Taylor had been given a medical clearance exam, his methamphetamine complication would have been discovered and he likely would have survived. She does not, however, connect this opinion to any alleged breach of the standard of care for police or corrections officers and thus cannot say to a reasonable degree of medical probability that any such breach proximately caused Mr. Taylor's death. Furthermore, any such connection would require impermissible speculation that a medical clearance exam would have uncovered a treatable complication and that Mr. Taylor would have received treatment preventing his death.

Plaintiffs cannot use their corrections expert, Cameron Lindsay, to supply the missing causation opinion. By his own admission, Mr. Lindsay is not a medical expert. UMF 29. Therefore, he is not qualified to opine to a reasonable degree of *medical* probability as to whether any alleged breaches in the standard of care caused Mr. Taylor's death or a reduction in his chance of survival. *See Zia Tr.*, 258 P.3d at 1151 (noting that a medical expert is required to establish that failure to provide emergency medical assistance caused a loss of chance of survival). Nor can he rely on Dr. Harvey's opinions to reach a medical causation opinion. *See, e.g.*, *Mooring Cap. Fund, LLC v. Knight*, 388 F. App'x 814, 820 (10th Cir. 2010) ("An expert is not entitled to testify to opinions that rely on the opinion of another expert, simply because the other is an expert.").

Plaintiffs' experts fall far short of showing that any act or omission of Defendant caused Mr. Taylor's death or "deprived [him] of a measurable chance of recovery." *Baer*, 972 P.2d at 12. Accordingly, the Court should grant summary judgment to Defendant on the negligence and loss of chance claims due to lack of medical expert testimony to establish causation.

**IV.  If the Court Grants Summary Judgment on the Loss of Chance and Negligence Claims, It Should Also Grant Summary Judgment on the Loss of Consortium Claim.**

To prevail on their loss of consortium claim (Count IV), Plaintiffs "must prove the underlying tort." *Lucero v. United States*, No. CIV 17-0634 SCY/JHR, 2019 WL 5697882, at *3 (D.N.M. Nov. 4, 2019). Here, the only underlying torts remaining in this case are the claims for negligence and loss of chance. *See* Doc. 32 (dismissing Count II, which raised claims of negligent training, administration, and supervision). Summary judgment on these underlying torts compels dismissal of the derivative loss of consortium claim. *See Amparan v. Lake Powell Car Rental Companies*, 882 F.3d 943, 951 (10th Cir. 2018) (citing *Thompson v. City of Albuquerque*, 397 P.3d 1279, 1281 (N.M. 2017)).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment on all remaining claims and dismiss this action.

Respectfully submitted,

FRED J. FEDERICI
United States Attorney


*/s/ Christine H. Lyman 5/4/2022*
CHRISTINE H. LYMAN
Assistant United States Attorney
District of New Mexico
P.O. Box 607
Albuquerque, NM 87103
505-346-1532
Christine.Lyman@usdoj.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that on May 4, 2022, Defendant United States filed through the United States District Court CM/ECF System the foregoing document, causing it to be served by electronic means on all counsel of record.

                                      */s/ Christine H. Lyman 5/4/2022*
                                      CHRISTINE H. LYMAN
                                      Assistant United States Attorney