IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MINNIE TAYLOR, Individually and
as Personal Representative of
the ESTATE OF LOUIE TAYLOR,
and HAROLD CUTHAIR,

        Plaintiffs,

vs.           Case No.
              21-cv-00613-GJF-JFR
THE UNITED STATES OF AMERICA,

        Defendant.


**DEPOSITION OF VIRGINIA E. HARVEY, M.D.**
March 25, 2022
8:30 a.m.
via videoteleconference


   PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MS. CHRISTINE H. LYMAN
     Attorney for the Defendant




REPORTED BY: MABEL JIN CHIN, NM CCR #81
     Bean & Associates, Inc.
     Professional Court Reporting Service
     201 Third Street Northwest, Suite 1630
     Albuquerque, New Mexico 87102

(6380N) MC

Exhibit D

Page 22

1   enclosed a summary of facts." It says "The summary of
2   facts provides a timeline of when Mr. Taylor was taken
3   into custody to when he died in his jail cell." How
4   did the summary of facts play into your opinions in
5   this case?
6       A. The summary of facts allowed for me to
7   better understand the circumstances surrounding the
8   death of Mr. Taylor, so it did play into my opinions
9   insofar as it elucidated how he presented to the jail
10  and how he acted in the jail prior to his death.
11      Q. Am I correct to say, though, that your
12  opinion doesn't really go into timing in terms of --
13  well, I guess I don't remember seeing anything about
14  if X happened at Y time the result would have been
15  different; is that correct? Is that fair?
16      A. I don't -- I don't quite understand the
17  question.
18      Q. Although I recall seeing in your report --
19  and we'll go into this later -- that you go through a
20  timeline, a summary of facts, your opinion doesn't
21  really have a timeline; is that correct?
22      A. Um -- my opinion, as far as I recall, does
23  not have a -- just give me one second to pull up my
24  opinion.
25      Q. Sure. Take your time.

Page 23

1       A. So my opinion in the summary of events
2   certainly does have a timeline within the summary of
3   of events, including when the police were dispatched,
4   when Mr. Taylor was detained, when he was booked and
5   when he was found unresponsive. So that timeline is
6   reflected in my summary.
7       Q. And I apologize, I feel like I'm not making
8   myself clear enough, and I apologize for that. But I
9   guess I was referring to your medical opinions in this
10  case. So if you scroll further down or look, you
11  know, to after the factual summary --
12      A. Okay.
13      Q. -- when you talk about the clinical findings
14  and your opinions about what could have happened in
15  this case, are you -- did that timeline factor into
16  those opinions?
17      A. My opinion in this situation is essentially
18  that there was a patient who was displaying evidence
19  of a medical emergency, including hallucinations and
20  agitations, and had he been afforded timely medical
21  care he likely could have been saved prior to
22  succumbing to his cardiac arrest.
23      Q. And given that you were given this timeline
24  by Mr. Buffington's firm, that timeline, when did it
25  start? And feel free to look at it, because I think

Page 24

1   it's part of the file.
2       A. Yes. So I have February 29th, 2020 at
3   7:48 p.m. a sergeant from the Navajo Nation Division
4   of Public Safety was dispatched to a residence
5   regarding a male.
6       Q. Okay. So is it fair to say that when
7   considering this case, that in your analysis you are
8   just starting at 7:48 p.m.?
9       A. Correct.
10      Q. So you don't know anything that happened
11  before 7:48 p.m. on February 29th, 2020?
12      A. That is correct.
13      Q. And you were not asked at all to consider or
14  think about that time period; is that correct?
15      A. Prior to the -- no, that is correct.
16      Q. Okay. And so I will scroll back up to where
17  we just were. So, I think you alluded to this, but in
18  this paragraph -- I think it's the third paragraph of
19  the letter, and I'm going to highlight it here -- it
20  says "We would appreciate receiving your written
21  opinion regarding a narrow question. Given the amount
22  of amphetamine and methamphetamine found in
23  Mr. Taylor's system noted on the toxicology report,
24  could Mr. Taylor have been saved if he received timely
25  medical intervention?" Does that accurately summarize

Page 25

1   what you were asked to do in this case?
2       A. Yes.
3       Q. Is it fair to say that they are not asking
4   you about what caused Mr. Taylor's death?
5       A. That is fair to say.
6       Q. Is it fair to say that you are -- you are
7   relying on the autopsy results to provide you with the
8   cause of death?
9       A. I'm relying on the autopsy results and the
10  clinical picture that was painted by the documents
11  provided, and then subsequently by the video evidence
12  that I reviewed.
13      Q. Did you independently determine a cause of
14  death, in your opinion?
15      A. No. I do not think it's possible for me to
16  do that based on the documentation that I received.
17      Q. And why is that?
18      A. Well, Mr. Taylor didn't have a medical exam,
19  so certainly we are relying on the autopsy report.
20  And I do not argue with the autopsy report, but when a
21  patient presents with hallucinations and agitation,
22  the differential diagnosis is very wide. And so, the
23  patient did not receive a medical screening exam so
24  there are things that could have caused his death that
25  we were not able to ascertain because he was not

Exhibit D

**Page 26**

1   evaluated.
2   Q. So you are saying that because an evaluation
3   didn't happen while he was still alive, you find it --
4   I don't want to put words in your mouth -- but do you
5   find it impossible to determine his cause of death
6   independently, or how would you characterize whether
7   you can do that or not?
8   A. I mean, I would rely on the medical examiner
9   to determine his cause of death.
10  Q. Okay. So you are relying, then, on that
11  autopsy and the finding?
12  A. Yes.
13  Q. Thank you. And is it also fair to say that
14  you were not asked to provide an opinion about whether
15  any particular person's conduct caused or contributed
16  to Mr. Taylor's death; is that correct?
17  A. Correct.
18  Q. Okay. I'm going to now scroll down again,
19  and I apologize, page 19. Okay.
20      So here are some E-mails between you and
21  Ms. Fosbinder. This one is dated January 19th, 2
22  o'clock, and you say, "Ms. Fosbinder, Upon review of
23  documents provided for Mr. Louie Taylor, I do have one
24  additional question. Please let me know if you are
25  available today or tomorrow for a very brief one- to

**Page 27**

1   two-minute phone call." So, do you recall what this
2   question was?
3   A. As I recall, it was wondering if there was
4   -- let me just -- if there was an intake form provided
5   at the jail that included a set of vital signs and any
6   further medical information.
7   Q. And what did Ms. Fosbinder tell you about
8   that?
9   A. She did provide me with the intake form.
10  Q. And that was -- that responded to your
11  question, then?
12  A. Yes.
13  Q. So I see it says, and I'm scrolling further
14  down the page, it looks like there was an attachment,
15  "Louie Taylor Medical Screen and NNMC records.PDF."
16  Can you tell me what documents were included in this
17  PDF?
18  A. That was just, like I said, the
19  documentation regarding the screening form that is
20  performed by the jail. And then I believe during that
21  -- it also included the medical records from his
22  presentation in cardiac arrest to the hospital.
23  Q. So those would have been medical records
24  from Navajo -- sorry -- Northern Navajo Medical Center
25  on March 1st, 2020; is that correct?

**Page 28**

1   A. Yes.
2   Q. Do you recall ever receiving any other
3   medical records regarding Mr. Taylor from prior to his
4   death?
5   A. I do not recall receiving anything.
6   Q. And then I see, then, in this response from
7   Ms. Fosbinder, that she says, "Unfortunately -- we,
8   unfortunately, do not have a copy of the EMS report
9   when Louie was transported from jail after he was
10  found unresponsive." Is that something that you asked
11  her about?
12  A. I do not think that I asked her about that
13  specifically.
14  Q. Okay. So I'm going to now scroll down to
15  the next page, page 20 of this PDF. Sorry. This is
16  taking me a little bit longer than -- there we go.
17      So I see an E-mail dated January 24th, 2022
18  from you. You say "Tracy, I have completed the
19  requested draft report for Mr. Taylor. How would you
20  like to receive it?"
21      In doing your work in this case, Dr. Harvey,
22  did you create one or more drafts of this report?
23  A. I did not. I have my report and I have the
24  addendum.
25  Q. Okay. So you didn't have, you know, working

**Page 29**

1   drafts that you edited and then finalized?
2   A. No.
3   Q. Okay. And so I noticed that you are asking
4   about sending an E-mail -- or sorry, sending your
5   draft via E-mail to Tracy. That would be your final
6   draft, then; correct?
7   A. Correct.
8   Q. And I noticed, though, that your report is
9   dated January 18th, 2022. Is it fair to say that that
10  date is inaccurate?
11  A. No. It's likely that I finished it on that
12  day and sent it on the 24th.
13  Q. Okay. So -- all right. Well, let's look at
14  -- well, let's turn to the first page of this PDF.
15      Sorry, I didn't want that page. I wanted
16  your invoice, which I think is below here.
17      So I'm looking here at the second page of
18  the PDF. It's an invoice and your name is at the top.
19  A. Okay.
20  Q. It says "Re: Louie Taylor."
21  A. Yes.
22  Q. So the first entry it says, document review
23  and report writing, 1/18/2022, 47 minutes.
24  A. Okay.
25  Q. Does this refresh your recollection as to

**Page 82**

1 patient will likely require during their emergency
2 stay.
3     So a level 1 patient is very, very sick and
4 near death. They are essentially a patient that
5 requires resuscitation and will require a lot of
6 resources. And then a level 5 patient is somebody who
7 needs to have, for example, a suture removed and
8 requires very few resources. And then, 2s, 3s and 4s
9 lie in between those. When a patient is assigned an
10 ESI, they are typically brought back from the waiting
11 room based on their ESI level.
12     Q. So, when you say brought back from the
13 waiting room, are you saying that after they have been
14 assigned an ESI level, then people are, I guess, seen
15 kind of in the order of severity?
16     A. Correct.
17     Q. Okay. So, if you are, let's say, a lower
18 level of severity, like a 3 or 4, you would be
19 expected to wait in the waiting room until people with
20 higher scores -- or sorry, lower scores of severity
21 have been assessed; is that right?
22     A. It's -- that is generally true, although
23 many emergency departments have a dedicated area
24 called -- sometimes it's called a fast track, where
25 there is one provider that can see those patients in

**Page 83**

1 an area that is designated to be lower acuity without
2 taking up the resources that the higher acuity
3 patients would require. So it isn't necessarily like
4 you would wait in the ER all day until all of the 2s
5 and 3s would go, but there are sometimes two tracks.
6     Q. Okay. But you don't know what the system
7 was at Northern Navajo; correct?
8     A. I don't, but the hospitals that I have
9 worked at have all used the ESI criteria to determine
10 patient acuity, resource utilization, anticipation.
11     Q. But you don't know whether Northern Navajo
12 had this extra person, fast track type of situation?
13     A. I have no -- no, I do not know what their
14 staffing model is up there.
15     Q. Okay. Well, so, is it fair to say that
16 people often wait in the emergency department to be
17 seen after they have been triaged?
18     A. It is.
19     Q. Do you happen to know what the wait times
20 are at your hospital?
21     A. I don't know, and it really varies based on
22 how sick somebody is. So, the wait times have been
23 very short when there is nobody waiting, we can bring
24 them right back into the triage in the room. But when
25 the ER is busy, the wait times can be upwards of, you

**Page 84**

1 know, three hours.
2     Q. Is it uncommon to have wait times of over
3 three hours in an emergency room, in your experience?
4     A. It really depends on the emergency room.
5     Q. Okay. So, you said that people who are
6 brought in by the police sometimes go through the
7 ambulance bay. Is there a different triage process,
8 or how does that work for people who come in through
9 the ambulance bay?
10     A. So, at my hospital patients come in through
11 the ambulance bay. They are seen by the charge nurse,
12 who is the nurse that oversees the department and
13 manages the flow of the department. And the charge
14 nurse asks the police or the paramedics, because they
15 both kind of present through the same pathway, what
16 the chief complaint is, what recent sets of vital
17 signs have been obtained, and kind of makes a very
18 quick assessment of the severity of the patient's
19 condition. And then the triage nurse typically then
20 assigns the patient and the police officer a room at
21 that time.
22     Q. Okay. And then after they are assigned a
23 room in your -- just -- this is at your hospital or
24 the hospitals you worked at, how long is it until they
25 see a doctor?

**Page 85**

1     A. It's usually pretty quick.
2     Q. And is it usual that a doctor has to see
3 them, or is it enough that the nurse, the charge nurse
4 or the triage nurse has taken a look?
5     A. No. The doctor has to see them and provide
6 a medical screening exam.
7     Q. And what is involved in a medical screening
8 exam, in your experience?
9     A. So the first part is to obtain a history of
10 the patient to figure out what they are presenting
11 with. Everybody gets a set of vital signs to see if
12 there are any major vital sign abnormalities, and then
13 everything kind of flows from there. So, the patients
14 that come to the emergency department in a medical
15 screening exam are vast. Some patients come in
16 because they hit their head three days ago and they
17 just need someone to say that they are okay. Some
18 patients come in with severe medical emergencies that
19 require admission to the hospital or transfer to an
20 intensive care unit. The severity of patients
21 presenting using medical -- for a medical screening
22 exam is wide.
23     Q. And so, are there specific criteria that are
24 used to determine whether somebody, I guess, is clear
25 to go?

Exhibit D

86

1  A. There are not specific criteria. It is
2  based on the medical experience and the decision of
3  the provider or the physician taking care of them. So
4  as an emergency medicine physician, we are trained to
5  recognize and respond to acute medical conditions.
6  And if we find that there is none, then, we think that
7  the patient is safe to go home.
8  Q. Or to go to jail if they are being booked
9  into jail?
10  A. Correct.
11  Q. Let's see. So, in your experience in the
12  emergency department of various hospitals, you talk
13  about sometimes having people do drug screens for meth
14  and I think you mentioned it was a urine test; is that
15  right?
16  A. Correct.
17  Q. Can you explain to me how these urine tests
18  work?
19  A. Um -- I don't know the laboratory processes
20  for determining the different metabolites found in the
21  urine samples.
22  Q. Are you saying that it is only testing for
23  meth metabolites, or is it testing for meth itself?
24  A. No, it's testing for meth, but it's a rapid
25  urine drug screen, so it's a set of drugs that are

87

1  screened on one sample. It's actually not even meth,
2  it's just amphetamines. They are often screened for
3  cocaine, THC, and various other illicit substances.
4  Q. In the urine test, you said it's a
5  qualitative test; correct?
6  A. It's qualitative.
7  Q. So, that means you don't know the actual
8  concentrations that are presenting; correct?
9  A. Yes.
10  Q. Do you happen to know any information about
11  false positives or negatives coming from urine tests?
12  A. I am sure that there are false positives and
13  false negatives if patients are on -- you know, if a
14  patient takes medication for ADHD they can certainly
15  screen positive for amphetamines and them not taking
16  methamphetamine.
17  Q. What medications for ADHD are you referring
18  to?
19  A. Like Adderall, methylphenidate.
20  Q. What is -- I'm sorry, what is Adderall?
21  A. It is a medication used to treat ADHD.
22  Q. But what is the chemical?
23  A. Amphetamine derivative.
24  Q. So it's an amphetamine derivative that could
25  cause false positives in a urine drug screen at a

88

1  hospital?
2  A. Yes.
3  Q. How long does it generally take to get the
4  results back from a urinalysis for testing for drugs?
5  A. Um -- an hour, I would say, roughly.
6  Q. Is it fair to say, Dr. Harvey, that in the
7  clinical setting that you do not generally get
8  quantitative drug screen results for drugs?
9  A. Not for that drug.
10  Q. Okay. And why is that?
11  A. Because it doesn't change the outcome.
12  There are certain drugs that you do need to get a
13  quantitative screen. So, if somebody comes in with a
14  Tylenol overdose, it matters a lot what their serum
15  level of Tylenol is and the time since ingestion and
16  that determines how you treat the patient. But in
17  this circumstance, it does not matter.
18  Q. Do you happen to know if your hospital has
19  laboratory capabilities for doing quantitative testing
20  for methamphetamine?
21  A. I don't think that we do, but I'm not sure
22  that we don't.
23  Q. Okay. And you don't know whether any
24  labs -- or sorry -- any hospital such as Northern
25  Navajo has that capability?

89

1  A. I don't know.
2  Q. Okay. And do you generally know how long it
3  takes to do a quantitative test for methamphetamine?
4  A. I don't know how long it takes.
5  Q. Okay. Now, I want to turn back to your
6  report here. And so, I wanted to ask you about when
7  you say moderate to severe methamphetamine toxicity,
8  is this a qualitative determination?
9  A. No.
10  Q. So, tell me what you mean by moderate to
11  severe. What does that mean to you?
12  A. Sure. So, I have had patients come to the
13  emergency department telling me that they have taken
14  methamphetamine and they don't feel well, and I would
15  consider those patients mild toxicity. Somebody who
16  is experiencing active hallucinations, I would say
17  they are experiencing at least moderate to severe
18  toxicity based on their clinical presentation.
19  Q. What about somebody who is, you know, having
20  some of these what you refer to as potentially
21  life-threatening complications? Are these moderate?
22  Severe? How would you classify these life-threatening
23  complications?
24  A. I think if somebody is having a
25  life-threatening complication to methamphetamine

production@litsupport.com    Bean & Associates, Inc. 201 Third Street NW, Ste. 1630, Albuquerque New Mexico 87102    505.843.9494

Exhibit D

Page 142

1  are one of the peer reviewers?
2  A. Yes.
3  Q. And you did rely on this Critical Care
4  article to support your opinions in this case; is that
5  right?
6  A. Yes.
7  Q. So, would you agree that this particular
8  article is a reliable and authoritative source of
9  information about meth toxicity levels?
10 A. I would.
11 Q. Okay. And so, the therapeutic and the toxic
12 columns in that article, to your knowledge, are these
13 antemortem or postmortem values?
14 A. I would have to review the article again.
15 Q. Okay. But can we assume, though, that if
16 the values are taken from people who didn't die of
17 meth toxicity, that these would be antemortem values?
18 A. I would have to look at the article again.
19 Q. Okay. And so, are you assuming for purposes
20 of this opinion that antemortem blood concentrations
21 of methamphetamine are going to be similar to
22 postmortem blood concentrations of methamphetamine?
23     MR. BUFFINGTON: Objection, form and
24 foundation. Answer if you can, Doctor.
25 A. I think that a lot of things -- the time

Page 143

1  since death matters. I don't think that you can
2  correlate them. I think there are a lot of variables.
3  Q. Okay. So you can't tell me, sitting here
4  today, whether an antemortem meth concentration is
5  going to be comparable to a postmortem meth
6  concentration level without having further
7  information?
8  A. Correct.
9  Q. Okay. Now, what you say here is that -- um
10 -- "Therefore, while Mr. Taylor was clearly suffering
11 the toxic effects of methamphetamine, made most
12 obvious at the time by his clinical presentation, his
13 postmortem femoral blood concentrations were not
14 exceptionally high as to suggest an unsurvivable
15 overdose, and he likely could have been saved by
16 timely medical intervention."
17     So, this is a lot to unpack but I would like
18 to ask you, are there any specific medical
19 interventions you have in mind here?
20 A. So, I certainly think that he should have
21 been evaluated. He didn't receive any medical
22 intervention. And I think this sentence really is the
23 crux of what I believe, is that his clinical
24 presentation at the time is the most telling sign that
25 he is having a medical emergency, specifically

Page 144

1  agitation and hallucination.
2      So, if this person was brought to me for a
3  medical clearance in this state, I would have done
4  things that we discussed previously. I would have
5  gotten a history from him if I could, from the police.
6  I would have obtained a set of vital signs. I would
7  have given him some fluids and checked some labs. I
8  would have seen if there were any obvious reversible
9  medical problems that were contributing to his
10 condition.
11     I think his clinical presentation is really
12 the finding that is most concerning to me.
13 Q. But sitting here today, you cannot identify
14 a specific medical intervention that you believe would
15 have saved his life?
16 A. A medical screening exam would have been the
17 intervention. It would have been the opportunity to
18 provide him with medical care is the intervention. We
19 don't know what he -- what was going on because he was
20 not provided the care.
21 Q. Okay. So, you are saying that he should
22 have been given some kind of medical screening?
23 A. Yes.
24 Q. Okay. Now, I'm going to go down to your
25 opinions. I think some of this is repetitive of what

Page 145

1  we talked about before so we don't need to go into it.
2      Here you say "Patients who suffer acute
3  methamphetamine toxicity are at risk for several
4  life-threatening, yet largely treatable
5  complications." I would like to know what you mean by
6  largely treatable, because seems to imply to me, at
7  least, that sometimes it might not be treatable?
8  A. I mean, certainly, so -- I mean, that's how
9  emergency medicine is. People show up in all sorts of
10 conditions and you do your best, and sometimes you
11 can't save them no matter what you do, and that is
12 just the case of it. But usually not. Usually when
13 patients present to the emergency department with a
14 medical emergency, there are people there who are
15 trained to respond to their medical emergencies. And
16 these medical emergencies, these life-threatening
17 complications, including hyperkalemia, including
18 acidemia, seizures, they are largely treatable,
19 sometimes not, but that's just how it goes.
20 Q. Okay. So you can't say 100 percent sure
21 that it would have been treatable if he had gotten the
22 screening?
23 A. I can't say for 100 percent sure that
24 anybody -- I mean, 100 percent is 100 percent that --
25 you can't say that.

production@litsupport.com   Bean & Associates, Inc. 201 Third Street NW, Ste. 1630, Albuquerque New Mexico 87102   505.843.9494

Exhibit D

```
                                                        146
 1     Q.  Okay.  So, now, we touched upon this a
 2  little bit earlier, but you said that from
 3  documentation provided, Mr. Taylor had no significant
 4  medical comorbidities and there were no findings on
 5  his autopsy that would suggest an unsurvivable
 6  co-condition.  So tell me what medical documentation
 7  you reviewed pertaining to Mr. Taylor to reach this
 8  opinion?
 9     A.  So, I reviewed the documentation that was
10  provided regarding his visit to Northern -- the
11  hospital that he presented at in cardiac arrest, and I
12  reviewed the subsections for previous surgeries,
13  medical history, and there were no significant
14  findings in that documentation, for medical history in
15  that documentation.
16     Q.  Do you recall when his last physical exam
17  was?
18     A.  I don't.
19     Q.  Okay.  Do you recall whether it was in the
20  last ten years?
21     A.  I don't.
22     Q.  Do you recall if was in the last 15 years?
23     A.  I don't, but I can certainly re-review the
24  medical records that I was provided.
25     Q.  Okay.  So, other than the history that might
```

```
                                                        147
 1  have been captured in the hospital records from that
 2  one visit, you were not provided any other medical
 3  records pertaining to Mr. Taylor when you wrote this
 4  report?
 5     A.  Correct.
 6     Q.  Okay.  So, then you say, in the sentence
 7  that there were no findings that would suggest an
 8  unsurvivable co-condition, what do you mean by that?
 9     A.  There were no other findings on autopsy like
10  an aortic dissection, like, there was nothing on
11  autopsy that suggested that he had a catastrophic
12  condition that he was unsavable from.
13     Q.  Now, I think, if I recall correctly, when we
14  talked about some of those conditions you said you
15  either didn't know about how they would present on
16  autopsy or you wouldn't expect to see something on
17  autopsy.  Are there conditions that could kill you
18  that you might not be able to detect from an autopsy?
19     A.  Well, it really depends on what the autopsy
20  looks for.  I don't know if this autopsy looked for
21  slides, if there was any histopathology.  I don't
22  think you would be able to see any electrical
23  abnormalities because those are kind of real-time, and
24  also electrolyte abnormalities, unless you took a
25  sample of the blood or you had a sample from the
```

```
                                                        148
 1  emergency department to detect those abnormalities.
 2     Q.  Okay.  Then you say in the next sentence,
 3  "Additionally, and notwithstanding limitations in the
 4  interpretation of postmortem blood concentrations for
 5  toxic substances."  Can you explain to me what these
 6  limitations in the interpretation of postmortem blood
 7  concentrations are?
 8     A.  I mean, I think we talked about those
 9  already.  There's you can be habituated and have the
10  ability to withstand certain -- the toxic effects of
11  certain substances if you take them routinely, and
12  then also, your underlying medical comorbidities.
13  Those all determine how you will react or respond to
14  any of these substances.
15     Q.  And then also redistribution could also be a
16  factor?
17     A.  Yes.
18     Q.  Okay.  And then at the very bottom here you
19  state that "It is there for my medical opinion to a
20  reasonable degree of medical" -- I think this should
21  be "certainty"?
22     A.  It is.  I'm sorry.
23     Q.  -- "that had Mr. Taylor been afforded timely
24  and appropriate medical care it is likely that the
25  toxic effects of methamphetamine could have been
```

```
                                                        149
 1  discovered and treated, thereby preventing his death."
 2  So, first of all, when you say timely, is there a
 3  particular point in time that you think he should have
 4  been seen in the hospital?
 5     A.  I think any time prior to his cardiac arrest
 6  would have been good.
 7     Q.  But you didn't specifically consider any
 8  time prior to -- I think you said 7:48 p.m. on
 9  February 29th, 2020; correct?
10     A.  Well, I don't know what was happening prior
11  to that time.  There was no documentation provided to
12  me of what he was doing the rest of that day.
13     Q.  Okay.  If you -- hypothetically speaking, if
14  you knew that Mr. Taylor had been displaying similar
15  symptoms the day before, would your opinion also be
16  that he also should have been treated the day before
17  or screened the day before?
18     A.  Yeah.  If he was having hallucinations and
19  was agitated, I certainly think, especially if he was
20  taken into custody and was under the care of somebody
21  else, he should have been brought to the -- he should
22  have presented for treatment.
23     Q.  Is your opinion limited to if he had been in
24  custody, or should he have been taken for treatment
25  even if he hadn't been in custody?
```

production@litsupport.com    Bean & Associates, Inc. 201 Third Street NW, Ste. 1630, Albuquerque New Mexico 87102    505.843.9494

Exhibit D

**150**

1  A. **I think if he was hallucinating and agitated**
2  **he would have benefited from a medical evaluation.**
3  Q. Okay. And then when you say appropriate
4  medical care, are you assuming that is a type of
5  medical care that you said that you would provide if
6  you had seen Mr. Taylor that day?
7  A. Yes.
8  Q. Okay. Now, I would like to now move to your
9  addendum report, and I am going to put it up in just a
10  second here.
11  A. Sure.
12  Q. Let me make it a little bit bigger.
13     So, this addendum report, does this look
14  like the addendum report you drafted on or about
15  February 7, 2022?
16  A. Yes.
17  Q. Okay. And is that your signature at the
18  bottom here?
19  A. It is.
20     MS. LYMAN: Okay. Mabel, I would like to
21  mark this as Exhibit 7.
22     (Exhibit 7 marked.)
23  Q. (By Ms. Lyman) So, I notice up here that
24  you cite additional -- you say since submission of
25  your original report, you have been provided and have

**151**

1  reviewed the following document, and it is the EMS
2  report; is that right?
3  A. Yes.
4  Q. And is that the only information that you
5  received that you considered in formulating this
6  opinion in your addendum?
7  A. Yes.
8  Q. Okay. Now, what you say here, you provided
9  Summary, and this is taken from the EMS report; is
10  that correct?
11  A. Correct.
12  Q. And so I'd just like to turn to the
13  Discussion. You say "Prior to his death, Mr. Taylor
14  was displaying symptoms of moderate to severe
15  methamphetamine toxicity as manifested by his
16  significant psychomotor agitation, hallucinations, and
17  paranoia." And just -- I think we touched on it
18  earlier, but this is just based on what you have seen
19  in the record; correct?
20  A. Yes.
21  Q. And there was no effort to do any kind of
22  differential diagnosis because -- well, could you even
23  do a differential diagnosis of him at this point?
24  A. Based on what I saw in the record?
25  Q. Yes.

**152**

1  A. I mean, certainly I have a differential
2  diagnosis that -- but it's difficult to kind of rule
3  things out or rule things in based on not seeing
4  Mr. Taylor.
5  Q. Okay. And not having things like labs, for
6  example?
7  A. Right.
8  Q. Okay. So, you talk about hyperthermia,
9  which we discussed. You say it's a "well-known and
10  treatable complication of methamphetamine toxicity
11  which can itself lead to respiratory failure, cardiac
12  failure seizures, kidney injury, and sever electrolyte
13  imbalance, which can ultimately result in PEA and
14  death." What is PEA?
15  A. PEA is an acronym for pulseless electrical
16  activity.
17  Q. And how does hyperthermia cause PEA?
18  A. So, hyperthermia can lead to these
19  complications. You can become acidemic, you -- which
20  can lead to PEA. You can have rhabdo, become
21  hyperkalemic, kidney failure, and they can all lead to
22  a pulseless electrical activity.
23  Q. And so, that was the condition Mr. Taylor
24  was in when the EMTs came?
25  A. Yes, as far as I know.

**153**

1  Q. And does PEA indicate any kind of cardiac
2  event happening, in your experience?
3  A. So, PEA is a lot of different etiologies.
4  It can be cardiac. Cardiac can also cause ventricular
5  fibrillation and ventricular tachycardia.
6  Q. So, just knowing that somebody is found in a
7  state of PEA, there's no way to tell necessarily what
8  is causing the PEA?
9  A. No. So, if somebody is in the hospital you
10  go through something called your Hs and Ts. You think
11  of -- for H -- and this is not exhaustive -- there is
12  hypoxemia, there's, you know, hyperthermia. For Ts
13  there's thrombosis, there's tension pneumothorax. So
14  there are multiple things can cause PEA, and it's
15  difficult to determine exactly which one caused it
16  without doing a more thorough evaluation.
17  Q. So, down here you say "It is my opinion to a
18  reasonable degree of medical certainty that
19  Mr. Taylor's hours-long period of psychomotor
20  agitation, described as kicking, punching, yelling and
21  pacing, while being contained in a cell described by a
22  medical professional as," quote, "like a sauna," end
23  quote, "placed Mr. Taylor at a very high risk for
24  severe methamphetamine-associated hyperthermia, which
25  is life threatening but treatable with timely and

production@litsupport.com    Bean & Associates, Inc. 201 Third Street NW, Ste. 1630, Albuquerque New Mexico 87102    505.843.9494

Exhibit D

### Page 154

```
 1  quality medical care."  So I would like to unpack this
 2  a little bit.
 3      A.  Sure.
 4      Q.  What is your basis for stating that
 5  Mr. Taylor was having an hours-long period of
 6  psychomotor agitation?
 7      A.  I'm going to look at the summary of facts
 8  that I have.  Is that okay?
 9      Q.  Sure.
10      A.  So, let me pull it up.
11          So I'm looking at the in-custody death
12  investigation, Bates Number 001858.
13      Q.  Sorry.  Let me see if I can pull it up here.
14      A.  Sure.  That's it.
15      Q.  So, tell me, point to me where it says that
16  he was undergoing hours-long psychomotor agitation?
17      A.  So, I'm looking at number 3.  From the
18  timetable it looks like in the cell he was displaying
19  abnormal behavior by kicking, punching, and pacing in
20  a circle in his cell.
21      Q.  Okay.  So his behavior captured on facility
22  video.
23      A.  And then -- so, throughout his time in the
24  isolation cell he was yelling and pacing.
25      Q.  Well, isn't it true that it was noted that
```

### Page 155

```
 1  six cell checks were conducted, and those cell checks
 2  noted that he was yelling and pacing?  Do you have any
 3  way to know from this whether he was pacing the entire
 4  time, or was it just during those checks?
 5      A.  There is no way for me to know based on
 6  this.
 7      Q.  Okay.  So, you are just assuming, then, that
 8  the entire time he was in the cell he was in
 9  psychomotor agitation; correct?
10      A.  Well, the six times that they checked on
11  him, it seems from this that during all six of them he
12  was yelling and pacing in his cell.
13      Q.  But you are extrapolating from that the fact
14  that he must have been pacing at every other time,
15  even when he wasn't checked; is that correct?
16      A.  Yes.
17      Q.  So, turning back to your report, now, you
18  talk about the cell being described by a medical
19  professional as like a sauna.  You are referring to
20  the EMT; correct?
21      A.  Yes.
22      Q.  Do you know at what time the EMT arrived in
23  the cell?
24      A.  I have it here.  It looks like it was
25  12:12 a.m.
```

### Page 156

```
 1      Q.  Okay.
 2      A.  According to the report filed.
 3      Q.  12:12 a.m.  Okay.  Do you have -- well, is
 4  there any way to know if the cell felt like a sauna
 5  before 12:12 a.m.?
 6      A.  No.
 7      Q.  Okay.  So you are assuming, then, that both
 8  the entire time that he was in his isolation cell he
 9  was in a constant state of psychomotor agitation and
10  that his cell was like a sauna the entire time.  Are
11  those two assumptions that you are basing your opinion
12  on?
13      A.  Yes.  But they are assumptions that were
14  made based on the experiences from the people who were
15  there, based on what they have written.
16      Q.  Okay.  But you cannot say for sure what the
17  condition of the cell was in the time, the
18  three-and-a-half hours before the EMTs arrived; is
19  that correct?
20      A.  That is correct.
21      Q.  Okay.  Now, what you say here, though, is
22  that he was at very high risk for severe
23  methamphetamine-associated hyperthermia.  Are you
24  saying he did have severe methamphetamine-associated
25  hyperthermia, or he could have had it?
```

### Page 157

```
 1      A.  He could have had it.
 2      Q.  Is there any way to confirm this?
 3      A.  No.
 4      Q.  And are you basing this on any clinical
 5  observations, or just what is listed here?
 6      A.  I don't think that there are any clinical
 7  observations to be made because the patient did not
 8  receive a medical evaluation.  I am basing this on my
 9  experience wherein if a patient came to the emergency
10  department experiencing hallucinations and severe
11  psychomotor agitation, I would do my best to keep them
12  calm and cool and in an environment where they could
13  be monitored and cared for.
14      Q.  Do you -- if somebody was experiencing
15  severe methamphetamine-associated hyperthermia, would
16  you expect them to be diaphoretic?
17      A.  Typically, yes.
18      Q.  Okay.  So, just so that I am clear, in this
19  addendum you are not pointing to any clinical findings
20  of hyperthermia; correct?
21      A.  Correct.
22      Q.  And you are also not pointing to any autopsy
23  findings indicating hyperthermia; correct?
24      A.  I did not see any.
25          MS. LYMAN:  Okay.  And I am almost done,
```

production@litsupport.com    Bean & Associates, Inc. 201 Third Street NW, Ste. 1630, Albuquerque New Mexico 87102    505.843.9494

Exhibit D

**158**

1  actually. I was wondering if you guys would be okay
2  if we just powered through the last two pages of my
3  outline, and we can be done, or would you like to take
4  a break and break for lunch?
5      MR. BUFFINGTON: Could we take about a
6  five-minute break? I hear my dog doing something
7  strange.
8      MS. LYMAN: Okay.
9      (A discussion was held off the record.)
10     (A recess was taken from 12:19 p.m.
11          through 12:24 p.m.)
12  Q.  (By Ms. Lyman) Okay. So, Dr. Harvey, I
13  would like to now turn to what I will be showing you
14  on my screen here, so let me start sharing.
15     Do you recognize this article here?
16  A.  I do.
17  Q.  And what is this article?
18  A.  This is an article about acute --
19  methamphetamine acute intoxication.
20  Q.  And is this the article that we discussed
21  from UpToDate that is cited in your original report
22  dated January 18th, 2022?
23  A.  Yes, it looks like it.
24     MS. LYMAN: Okay. Mabel, I would like to
25  mark this as Exhibit 8. And I know I sent you a

**159**

1  different one as Exhibit 8, but I would like this
2  exhibit to be Exhibit 8, and the original Exhibit 8 to
3  be Exhibit 9.
4      (Exhibit 8 marked.)
5  Q.  (By Ms. Lyman) So this is an article that
6  you relied on in formulating your opinions in this
7  case; correct?
8  A.  Mostly as a refresher.
9  Q.  Okay. So I wanted to turn to page 10, and I
10 am sorry, but my mouse is acting up a little bit so --
11 okay. Got it back. And something that I was curious
12 about because I noticed it in this article is, "Sudden
13 cardiac arrest." Can you tell me what sudden cardiac
14 arrest is?
15 A.  It is -- it is sudden. It's when your heart
16 stops suddenly.
17 Q.  Is sudden cardiac arrest a known
18 complication for meth intoxication?
19 A.  Yes.
20 Q.  And so, how does it differ from the ones we
21 talked about, such as heart attack and arrhythmia?
22 A.  So when a patient presents with agitation
23 and hallucination, you -- I don't understand quite the
24 question. So there are -- how is it different? It's
25 a different entity.

**160**

1  Q.  Okay. So it's different from arrhythmia,
2  it's different from heart attack; correct?
3  A.  Yes.
4  Q.  Okay. And so, I guess, tell me what -- how
5  does a person in sudden cardiac arrest present?
6  A.  A person in sudden cardiac arrest usually
7  presents nonresponsive with no pulses.
8  Q.  Now, tell me what -- how would you treat
9  somebody who presents that way?
10 A.  So you would have to figure out why they
11 arrested, and it's some of the same pathways that we
12 talked about earlier. Did they arrest because they
13 were having a heart attack? Did they arrest because
14 they had a fatal pulmonary embolism? Do they have
15 severe renal dysfunction? Most pathways eventually
16 lead to cardiac arrest.
17 Q.  But in terms of, you know, if a person is
18 presenting in the hospital pulseless and unresponsive,
19 how would you treat that person?
20 A.  Well, it depends what the arrest is. So, if
21 someone is suffering from a V-fib arrest, so a
22 ventricular fibrillation, you would shock them. If
23 somebody is presenting in PEA you would try to
24 determine how they entered PEA. You would check a
25 glucose. You would check a chest x-ray. You would

**161**

1  listen to their lungs to see if they have a
2  pneumothorax. You would administer medications,
3  including epinephrine or bi-carb. You would see if
4  they were bleeding. You would undertake this whole
5  series of events to determine why they had arrested
6  and what reversible causes of the arrest are present.
7  Q.  Well, I guess I'm confused, because I would
8  imagine if somebody came to an ER either in an
9  ambulance, or their family member somehow brought them
10 in, and they had no pulse and they were unresponsive,
11 would you want to do something like CPR?
12 A.  Oh, of course.
13 Q.  Okay. And what else might you do?
14 A.  So you would start with the ACLS algorithms.
15 So you would start with chest compressions. You would
16 intubate the patient. You would obtain IV access, and
17 you would go down the pathways that I had previously
18 discussed.
19 Q.  Would you potentially administer an
20 automated -- is it external defibrillator or
21 electronic?
22 A.  It's external. So, in the hospital we would
23 not use an automated. We look at the rhythm ourselves
24 and determine if a shock was required.
25     So an AED are those packs at airports where

production@litsupport.com   Bean & Associates, Inc. 201 Third Street NW, Ste. 1630, Albuquerque New Mexico 87102   505.843.9494

Exhibit D

162

1  you can put it on the chest and then it tells you
2  whether or not to deliver a shock. But we don't use
3  those in the emergency department because we just
4  don't.
5      Q. All right. Would an EMT have an AED?
6      A. Yes.
7      Q. Okay. Now, you mentioned PEA. Is PEA
8  something that might be indicative of a sudden cardiac
9  arrest?
10     A. PEA is one form of cardiac arrest.
11     Q. Now, I'm looking back at this article from
12 UpToDate. It says, "Despite appropriate and
13 expeditious management, some patients with severe
14 methamphetamine intoxication will sustain sudden
15 cardiovascular collapse." Can you explain what sudden
16 cardiovascular collapse means?
17     A. So, typically it means that you -- your
18 cardiac output cannot sustain the function required to
19 keep you alive.
20     Q. And so, what do you interpret appropriate
21 and expeditious management to mean in this setting?
22     A. So, if a patient presents I -- fluids,
23 electrolyte replacement, dialysis as needed, cooling
24 as needed.
25     Q. So, is it fair to say, then, that what this

163

1  article from UpToDate is saying that despite having
2  all those interventions -- I'm presuming a screening
3  as well -- that some patients with severe
4  methamphetamine intoxication can still experience a
5  sudden cardiac event?
6      A. Yes.
7      Q. And then it says, "No predisposing factors
8  rigorously predict collapse." So, is it also fair to
9  say it's not necessarily predictable, even to a
10 doctor, if sudden cardiac arrest or cardiovascular
11 collapse will occur in a patient?
12     A. It's true that you can't always predict, but
13 certainly if somebody comes in wildly agitated to the
14 point that they need be to sedated, they will be kept
15 in a hospital setting for the appropriate amount of
16 time to hopefully be in the hospital when something
17 untoward happens to them.
18     Q. Okay. So, are you saying that being in the
19 hospital is better than not being in a hospital when
20 something like this happens?
21     A. Yes.
22     Q. Okay. Um -- and this sentence here also
23 interested me. It says "The multifactorial nature of
24 cardiovascular collapse makes successful resuscitation
25 notoriously difficult, even when arrest is witnessed."

164

1  So, what do you think this means?
2      A. It means to me that it's probably difficult
3  to resuscitate somebody who suffers from
4  cardiovascular collapse in this setting.
5      Q. And so when you say in this setting, do you
6  mean in the hospital?
7      A. I mean in the setting of methamphetamine
8  toxicity.
9      Q. Okay. And I'm asking you about the part
10 where it says "even when arrest is witnessed." Is it
11 fair to say that when an arrest is witnessed it's more
12 likely that somebody will get intervention?
13     A. Yes.
14     Q. So, is it fair to say, from what this
15 article from UpToDate is telling us, is that even when
16 somebody is getting that medical care that you would
17 provide, which is the medical screening and all those
18 interventions, and even when the patient is in the
19 hospital, the patient can still have a cardiac event,
20 such as sudden cardiovascular collapse or sudden
21 cardiac arrest, that could be unable to be survivable;
22 is that correct?
23     A. I mean, that's always the case. You can't
24 be 100 percent sure that you are going to save
25 everybody 100 percent of the time, even if you do your

165

1  best.
2      Q. Okay. Are you aware of statistics about the
3  percentage of patients who experience sudden cardiac
4  arrest who survive?
5      A. I don't know the statistics off the top of
6  my head, but I certainly can find them.
7      Q. In your best estimate, I would say, how --
8  are sudden cardiac arrests what you would categorize
9  as treatable or a treatable life-threatening
10 condition?
11     A. You can certainly treat somebody who is
12 suffering cardiac arrest.
13     Q. But do you know, is the chance of death from
14 a sudden cardiac arrest, is it more than 50 percent,
15 in general?
16     A. It's high, especially for out-of-hospital
17 cardiac arrest. The in-hospital cardiac arrest
18 survival rates I think are better. But again, I don't
19 know the specific numbers.
20     Q. Okay. Do you have any reason to dispute if
21 the American Heart Association said that its in-house
22 survival rate was less than 25 percent?
23     A. If that's what they say, I don't see any
24 reason to dispute that.
25     Q. So, I noticed that sudden cardiac arrest is

Exhibit D

166

1  not something that's listed in either of your reports.
2  Is there a reason why?
3      A.  No, there is not.  I -- if I had thought of
4  it then I would have put it in there.  I agree that
5  you can certainly suffer from a sudden cardiac arrest.
6      Q.  So you did not consider sudden cardiac
7  arrest when listing treatable conditions,
8  complications of meth toxicity; correct?
9      A.  I did not in my opinion.
10     Q.  Even though the fact of the matter is that
11 Mr. Taylor was found in PEA, and that is a type of
12 sudden cardiac arrest, you did not consider sudden
13 cardiac arrest in any of your opinions?
14     A.  So, PEA is also the endpoint of all the
15 other causes that I did.  PEA is not its own thing.
16 PEA is the endpoint of all of the complications that I
17 discussed.
18     Q.  Okay.  Um -- well, I really appreciate your
19 time today, Doctor.  I just want to confirm one last
20 time that you will not be making any changes or
21 additions to your opinions in this case, because this
22 is the last time I will get to speak to you?
23     A.  I will not be.  I do have those E-mails, if
24 you just want me to send them to you.  I guess --
25         You seem like you had some tasks that you

167

1  had given to me that I can complete.  I would just
2  like them to be listed out.
3      Q.  Sure.  The first, any E-mails that you
4  haven't produced yet.  And then, finally, the articles
5  that you relied on, if you could find -- you know, if
6  it's easy to find.  I don't want you to have to go
7  photocopying, like, a textbook, but if you have PDFs
8  or something that's easy for you to produce, I would
9  really like to see that.
10         MS. LYMAN:  And finally, then, Mabel, this
11 is former Exhibit 8, which will now be marked as
12 Exhibit 9.
13         (Exhibit 9 marked.)
14     Q.  Dr. Harvey, this is your fee schedule for
15 this matter; correct?
16     A.  It is.
17     Q.  I just want to make sure that you get paid
18 for your time today.  So if you wouldn't mind
19 providing Mr. Buffington with a W-9 and an invoice,
20 then he will send them to me and we will make sure
21 that you get paid.
22     A.  Thank you.
23         MS. LYMAN:  All right.  Thanks, everybody.
24 I hope you all have a great weekend.
25         MR. BUFFINGTON:  Can I ask a couple of

168

1  questions?
2          MS. LYMAN:  Sure.  I didn't want to cut you
3  off there.
4          MR. BUFFINGTON:  That's all right.
5                  EXAMINATION
6  BY MR. BUFFINGTON:
7      Q.  And I'm just following up on a few of the
8  questions that were asked.
9          Doctor, I believe you, in forming your
10 opinions or reaching your opinions, you reviewed a
11 medical screening form that was completed by Ariel
12 Lauing-Simms; is that correct?
13     A.  That is correct.
14     Q.  Okay.  And there were -- that form had a --
15 a section of certain conditions that upon admission
16 indicated or suggested the need for emergency
17 services, among which were difficulty breathing,
18 lacerations, skull deformity, hallucinations, vomiting
19 blood, chest pains, and suicide suggestions.
20     A.  Yes.
21     Q.  Do you recall reading that?
22     A.  I do.
23     Q.  And do you agree that these conditions
24 enumerated there or listed there, do, in fact, suggest
25 the need for emergency services?

169

1          MS. LYMAN:  Objection, form and foundation.
2      A.  I do think that patients who are displaying
3  those should probably be evaluated by a medical
4  professional.
5      Q.  Okay.  Now, in reviewing the materials that
6  you reviewed, was it evident to you that Mr. Taylor at
7  the time of his arrest, and at the jail, and while he
8  was in the cell, was experiencing hallucinations?
9      A.  Yes.
10     Q.  Okay.  And do you recall whether
11 correctional Officer Lauing-Simms on the form, the
12 screening form, indicated whether Mr. Taylor was
13 experiencing hallucinations?
14     A.  Well, will you bring up the form?  Do you
15 have the form?
16     Q.  I can't, I'm sorry, right now.
17     A.  I have it.  It just takes me a second.
18     Q.  Believe me, a few seconds is a lot less time
19 than it will take me.
20     A.  I just want to be clear.
21         I have it in front of me, and I am going to
22 hold up to the screen the form that you are referring
23 to so I can be clear.  Is this --
24     Q.  That is.
25     A.  So your question is?

production@litsupport.com   Bean & Associates, Inc. 201 Third Street NW, Ste. 1630, Albuquerque New Mexico 87102   505.843.9494

Exhibit D

170

1   Q.  What did that form indicate about whether or
2 not Mr. Taylor was suffering from any of those listed
3 conditions, difficulty breathing, lacerations, et
4 cetera?
5   A.  It is circled "no."
6   Q.  Okay.  So, as to those conditions, including
7 hallucinations, Correctional Officer Lauing-Simms
8 indicated no, he was not suffering from those?
9   A.  Correct.
10   Q.  Now, counsel asked you a number of questions
11 about the possibility of cardiac arrest or
12 cardiovascular collapse on the part of Mr. Taylor.  Do
13 you recall those questions?
14   A.  I do.
15   Q.  Now, from your review of the records, was
16 Mr. Taylor in custody at the jail from approximately
17 8:33 until at least 12:05?
18   A.  Yes.
19   Q.  Okay.  And during much of that time he was
20 agitated, hallucinating, yelling, pacing in his cell?
21       MS. LYMAN:  Objection, foundation.
22   Q.  Okay.  From your review of the records was
23 that the case?
24   A.  From what I have reviewed, yes.
25   Q.  Okay.  Now, if Mr. Taylor, while he was

171

1 still upright and alive, if during the, say, three
2 hours subsequent to his booking, if he had been
3 transported for medical care and if he had received
4 appropriate medical care, in your opinion could the
5 conditions which contributed to or may have
6 contributed to cardiovascular collapse have been
7 addressed medically?
8   A.  If he had been transported to a hospital and
9 received a medical screening exam, I do believe that
10 he would have started down a pathway in the hospital
11 that very likely would have uncovered any medical
12 emergencies for which he could have been treated.  We
13 don't know what those conditions were because he was
14 not seen.
15   Q.  If you could describe for us the
16 contributing factors which, in your opinion, may have
17 contributed to cardiac arrest or cardiovascular
18 collapse on the part of Mr. Taylor?
19   A.  So, not withstanding that I did not nor did
20 any physician see this patient, certainly if a patient
21 presented to me and they were severely agitated, I
22 would be concerned that that agitation could have been
23 a harbinger of some other medical problem.  I think
24 that he should have been evaluated.  If needed, he
25 should have been sedated and he should have been

172

1 allowed to be observed over a period of time until he
2 was no longer experiencing a medical emergency in the
3 form of hallucinations or significant agitation.  I
4 think that not allowing him the opportunity to receive
5 that medical care placed him at high risk for an
6 adverse outcome.
7       Does that answer your question or am I --
8   Q.  Yes, it does.
9       Specifically what would have been done to
10 address, in an appropriate emergency room context, and
11 in the context of Mr. Taylor, what would have been
12 done to address his -- his -- I'm using a lay term --
13 his agitation and movement, excessive movement?
14   A.  Well, that's not a lay term.  That's a term
15 we use as well.  So, if a patient came into my
16 emergency department and I saw him, I would be
17 concerned about the hallucinations and what was
18 causing them.  Certainly methamphetamine is a
19 possibility.  Alcohol withdrawal is certainly a
20 possibility, particularly in New Mexico, and that can
21 cause hallucinations.
22       You also have to think about a first
23 psychotic break.  This is a young man who was at the
24 age where he may develop psychosis from a psychiatric
25 standpoint.

173

1       So what I would have done, I would have
2 assessed him, gotten a set of vital signs.  If he was
3 persistently hallucinating and agitated, I would have
4 started with benzodiazepine, which is the first line
5 treatment for these agitated delirium patients.  There
6 are others available like ketamine and haldol, but I
7 think benzos are the safest, and certainly the first
8 line.
9       I would have placed -- had the nurses place
10 an IV.  I would have checked the labs on him to see if
11 he was suffering from renal failure, hyperkalemia, any
12 electrolyte abnormalities.  He would have received IV
13 fluids.
14       If he was very combative and not making
15 sense throughout the course of the evening, I would
16 have checked a head CT.  And every -- every step stems
17 from the previous step, and stems from what you see
18 first when you evaluate the patient, and then during
19 the observation of the patient over time.
20       I don't know the resources available at
21 NNMC.  I have never worked there.  But in my hospital,
22 I would have monitored this patient who was actively
23 hallucinating, and hallucinations are different than
24 delusions or paranoia.  Hallucinations is seeing other
25 things in the room or hearing other things in the

Exhibit D

## Page 178

1  A. I think that if a patient was presenting to
2  the hospital, they would probably -- I mean, it
3  depends what they are there for. It really depends on
4  who they encounter and why they are there. If there's
5  a security situation, if somebody is being violent or
6  disruptive in the waiting room, or somebody is
7  concerned there is a security situation, they probably
8  call security. If it looked like they needed medical
9  help, they would probably be seen by the triage nurse.
10  Q. And let's say hypothetically somebody came
11  into the waiting area of the emergency department at
12  your hospital warning everybody that aliens are
13  coming?
14  A. Uh-huh.
15  Q. How do you think that would be handled by
16  your staff?
17  A. I don't know how that would be handled. If
18  they -- it depends on who they encounter. If they
19  encounter a security guard first, I would assume they
20  would try to assess the situation for safety would be
21  the very first step.
22  Q. Does your hospital, your emergency
23  department frequently call police to take people away
24  who are disruptive?
25  A. We have called the police in the past if we

## Page 179

1  think that there is a dangerous situation.
2  Q. And so, do those calls get made without the
3  input of any kind of physician or nurse?
4  A. I don't -- I don't know the answer to that
5  question. I don't know everything that happens on the
6  hospital campus at all times.
7  Q. Were you ever asked in this case to provide
8  an analysis or opinion about the conduct of anybody at
9  Northern Navajo Medical Center?
10  A. No.
11  MS. LYMAN: Okay. I think that's it for me.
12  Thank you.
13  MR. BUFFINGTON: Okay. Read and sign.
14  MS. LYMAN: Okay. Fine with me.
15  (The deposition concluded at 12:54 p.m.)

## Page 180

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF NEW MEXICO
2
3
4  MINNIE TAYLOR, Individually and
   as Personal Representative of
5  the ESTATE OF LOUIE TAYLOR,
   and HAROLD CUTHAIR,
6
      Plaintiffs,
7
   vs.              Case No.
8                   21-cv-00613-GJF-JFR
   THE UNITED STATES OF AMERICA,
9
      Defendant.
10
11
12  CERTIFICATE OF COMPLETION OF DEPOSITION
13  I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY
   CERTIFY that on March 25, 2022, the deposition of
14  VIRGINIA E. HARVEY, M.D. was taken before me at the
   request of, and sealed original thereof retained by:
15
      Attorney for Defendant
16    FRED J. FEDERICI
      United States Attorney
17    Post Office Box 607
      Albuquerque, New Mexico 87103
18    BY: MS. CHRISTINE H. LYMAN
19  I FURTHER CERTIFY that copies of this certificate
   have been mailed or delivered to all counsel, and
20  parties to the proceedings not represented by counsel,
   appearing at the taking of the deposition.
21
   I FURTHER CERTIFY that examination of this
22  transcript and signature of the witness was required
   by the witness and all parties present.
23
   On_____ a letter was mailed or delivered to
24  Mr. Buffington regarding obtaining signature of the
   witness, and corrections, if any, were appended to
25  the original and each copy of the deposition.

## Page 181

1  I FURTHER CERTIFY that the recoverable cost of the
   original and one copy of the deposition, including
2  exhibits to Ms. Lyman is $_____.
3  I FURTHER CERTIFY that I did administer the oath
   to the witness herein prior to the taking of this
4  deposition; that I did thereafter report in
   stenographic shorthand the questions and answers set
5  forth herein, and the foregoing is a true and correct
   transcript of the proceeding had upon the taking of
6  this deposition to the best of my ability.
7  I FURTHER CERTIFY that I am neither employed by
   nor related to nor contracted with (unless excepted by
8  the rules) any of the parties or attorneys in this
   case, and that I have no interest whatsoever in the
9  final disposition of this case in any court.
10
11
12        _____
          MABEL JIN CHIN
13        Bean & Associates, Inc.
          NM Certified Court Reporter #81
14        License expires: 12/31/2022
15
16
   (6380N) MC
17  Date taken: March 25, 2022
   Proofread by: LR

Exhibit D