IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


MINNIE TAYLOR, Individually and
as Personal Representative of
the ESTATE OF LOUIE TAYLOR,
and HAROLD CUTHAIR,

        Plaintiffs,

    vs.             Case No.
                     21-cv-00613-GJF-JFR
THE UNITED STATES OF AMERICA,

        Defendant.


**DEPOSITION OF CAMERON K. LINDSAY**
March 23, 2022
8:30 a.m.
via videoteleconference


    PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY: MS. CHRISTINE H. LYMAN
     Attorney for the Defendant


REPORTED BY: MABEL JIN CHIN, NM CCR #81
     Bean & Associates, Inc.
     Professional Court Reporting Service
     201 Third Street Northwest, Suite 1630
     Albuquerque, New Mexico 87102

(6378N) MC

Exhibit G

30

Q. You just explained that your role was to determine whether there were departures from the minimal standards in this case, but earlier I asked you whether it was your, I guess, role in this case to opine on causation, what caused Mr. Taylor's death?

A. I thought you were talking about the manner in which he died. I thought we were going towards the realm of a medical expert, and clearly I'm not a medical expert, or have no medical training. So, maybe you can ask the question again.

I mean, I will say this. When I look at the departure from the minimal standards, and they led to the death of a human being, yeah, I'm going to make that nexus if I can, because it's right there in front of me, and that is what I did in this case.

From my perspective, Mr. Taylor died because he did not receive medical treatment, and that's exactly what should have happened from the very beginning. And that, to me, is a departure from minimal standards. Is that causation? Yeah, to me, I believe his death was caused because he didn't receive immediate medical care.

Q. Okay. We'll get into your opinions in this case later. So you are telling me that your opinion in this case is that the departure from the minimal

31

jail standards caused Mr. Taylor's death?

A. Of course.

Q. Okay. Now, I would like to then move on to the next paragraph in this letter from Ms. Fosbinder, dated January 11th. "Perhaps the prior death of the prisoner of Mr. Yazzie in our prior retained case might be woven into a narrative of the institutional knowledge that letting people in acute circumstances not being allowed to sleep it off without medical examination."

Now, I am not sure that the sentence makes grammatical sense to me, but what are you taking away from this sentence?

A. What I take away is that jail has a history. They do not have a positive history. People have died there, and I took a case where a person died there. So, what I was taking from it, and certainly Mr. Buffington didn't ask me to take anything from it, I don't believe, but that's what I got out of it, that they had repetitive serious issues within that correctional facility, and clearly they were still going on as recent as this.

Q. When you say repetitive, are you referring only to this Mr. Yazzie that's mentioned here, or what are you referring to?

32

A. I'm referring to the history of the jail going all the way back to the late '80s, early '90s, and the multitude of deaths that have occurred there. I can't tell you how many there were or the specifics of others, but that's where I would land on that.

Q. How do you know that there were a multitude of deaths in this jail?

A. I can recall reading some history about that jail a couple of years ago.

Q. Was that in connection with the Yazzie case?

A. I'm not sure. It may have been.

Q. And so, is that material that you read something that you relied on in forming any opinions in this case?

A. I am not really sure. I think -- look, I -- I never had a -- this kind of thing never happened in any of the jails or prisons that I operated, not one time ever. So, when I see a correctional facility that, from my perspective as an expert, I have taken two cases where there has been two deaths there of similar nature, where in my opinion these two individuals were severely neglected and there was a departure from minimal standards, yeah, that's going to cause me to look at that a little deeper. It's going to say to me that that's a problematic facility.

33

Q. Okay. Mr. Lindsay, I'm going to now move on to -- I think it's page 2 of this exhibit. It is a letter and the letterhead is Cameron Lindsay Consulting Services. I'm assuming that is from you; is that correct?

A. Yes.

Q. It's dated January 24, 2022, and it's directed to Mrs. Fosbinder. It says "The following represents my billing to date in the Taylor vs. U.S.A. matter."

So, the first entry is January 13, 2022. It says "review of materials, 2.7 hours."

And then the next entry is January 17, 2022, "review of materials, 8.2 hours." Do you recall what materials you reviewed over the course of these two different days?

A. Not off the top of my head, but there was a lot of volume, so it was probably -- well, I'm not going to say probably. I don't remember specifically.

Q. And then the next entry is January 19th, 2022. It says "Review of applicable ACA/NCHCC standards, 2.1 hours." Are those the materials that we talked about earlier, the handbooks from the two different organizations that you have?

A. Yes.

Exhibit G

146

1    A.  I -- I don't know.  I'll assume that it did
2  not, but I don't know for sure.
3    Q.  Okay.  Are you going to offer an opinion
4  that failure to fill out this form, that portion of
5  the form, has anything to do with his death?
6    A.  I would like to see the form first if I'm
7  going to make an answer to that.
8    Q.  Okay.  Well, I would like to at least submit
9  to you that there's no opinion like that in this
10  report, and I assume you're not going to offer one at
11  trial?
12    A.  Say again, please?
13    Q.  There is no opinion about the significance
14  of this missing form in this report, so can I assume
15  you won't be offering such an opinion at trial?
16    A.  I -- I don't know.
17    Q.  Can I assume that the opinions in this
18  report are a complete and accurate statement of the
19  opinions you have in this case?
20    A.  Repeat that, please?
21    Q.  Can I assume that the opinions offered in
22  this report are a complete an accurate summary of the
23  opinions you have in this case?
24    A.  Yes.
25    Q.  Okay.  All right.  I would like to, then,

147

1  turn to the section of your report that is captioned
2  Conclusion.  It is on page -- sorry, I'll go back
3  paragraph number.  On paragraph 149?
4    A.  Okay.
5    Q.  So, let's start with paragraph 149.  You
6  said his death from a drug overdose was foreseeable.
7  What about it was foreseeable?  How did somebody know
8  he was going to die?
9    A.  Yes.  Maybe a better word would be
10  preventable.
11    Q.  Okay.  So would you agree, then, that there
12  was no way to know that he was going to die?
13    A.  There is no way to know that someone is --
14  that they knew he was going to die.  I will agree with
15  that.
16    Q.  Okay.  You said "as a result of the actions
17  or inactions of the law enforcement and correctional
18  officers who arrested and detained him, Mr. Taylor
19  died of acute methamphetamine toxicity."  Can you just
20  explain to me quickly what the basis of that opinion
21  is?
22    A.  On everything we have talked about before.
23  They should have gotten him a -- they should have
24  brought him immediate medical assistance.  You can
25  blame Mr. Taylor for taking the drug, but from my

148

1  perspective that's what that sentence is about.  It's
2  about the result of inaction of law enforcement and
3  correctional officers.
4    Q.  But you don't have an opinion as to whether
5  if he had been taken to the hospital, whether he still
6  could have lived; correct?
7    A.  There's no way to know that.
8    Q.  Okay.  So it's entirely possible that he
9  might have died, anyway, even if he had been taken to
10  the hospital; correct?
11    MR. BUFFINGTON:  Objection, foundation.
12    A.  Within the realm of anything being possible,
13  it's possible.
14    Q.  Okay.  I'm just curious, did you review a
15  Dr. Virgina Harvey's report in this matter?
16    A.  What's the doctor's name?
17    Q.  Virginia Harvey.  She is the plaintiff's
18  medical expert?
19    A.  I did not, no.
20    Q.  Okay.  And then I wanted to ask you about
21  paragraph 151.  You said "Although they had a duty to
22  provide adequate medical care to Taylor by arresting
23  Mr. Taylor, the officers of the Navajo Nation Division
24  of Public Safety actively prevented him from obtaining
25  proper and immediate medical treatment."

149

1    I wanted to ask you about this concept of
2  actively preventing him.  Is this based on your
3  assumption that he was trying to get help when he got
4  arrested?
5    A.  No.  No, it's not.
6    Q.  What -- how are you basing this opinion that
7  they actively prevented him from obtaining medical
8  treatment?
9    A.  Because they had a duty to get him medical
10  treatment and they did not.
11    Q.  And that duty was, you think that was
12  triggered just by this very fact that he was showing
13  signs of intoxication?
14    A.  He was showing signs of methamphetamine
15  intoxication, yes.
16    Q.  Let's turn to paragraph 156.
17    A.  Okay.
18    Q.  I want to ask you about this concept of --
19  you know, you seem to criticize Officer Peshlakai for
20  wanting to have him in solitary.  You say here in
21  paragraph 157 that "his concern was never for the
22  safety of Mr. Taylor, but merely about the possibility
23  of disrupting these other five inmates that were being
24  detained at the jail."  But the previous paragraph he
25  is quoted as saying that "I put him in solitary for

Exhibit G